IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| CHAMBLESS ENTERPRISES LLC; and APARTMENT ASSOCIATION OF LOUISIANA, INC., | Case No. 3:20-cv-01455-TAD-KLH |
| Plaintiffs, | JUDGE TERRY A. DOUGHTY |
| v. | MAGISTRATE JUDGE KAREN L. HAYES |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director, Centers for Disease Control and Prevention; NINA B. WITKOFSKY, in her official capacity as Acting Chief of Staff, Centers for Disease Control and Prevention; ALEX AZAR, in his official capacity as Secretary of Health and Human Services; DEPARTMENT OF HEALTH AND HUMAN SERVICES; WILLIAM P. BARR, in his official capacity as Attorney General of the United States, | |
| Defendants. | |

**REPLY IN SUPPORT OF**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

   I.    THE CDC EVICTION MORATORIUM IS UNLAWFUL ..................................... 2

     A.    The CDC Order Exceeds Statutory Authority ..................................... 2

        1.    Longstanding Canons of Construction Limit CDC's Discretion ............................. 2

        2.    The Federalism and Constitutional Avoidance Canons Call for Rejection of CDC's Sweeping Assertion of Power ............................................... 6

           a.    The Statute Does Not Contain a Clear Statement That Congress Intended To Encroach Upon State Prerogatives ........................................ 6

           b.    This Court Should Employ Constitutional Avoidance ........................................ 7

     B.    The Government's Interpretation Violates the Non-Delegation Doctrine .................. 7

     C.    The CDC Order Is a Legislative Rule Subject to Notice and Comment ................... 10

     D.    The CDC Order Was Arbitrary and Capricious ..................................................... 12

   II.   PLAINTIFFS ARE SUFFERING IRREPARABLE HARM .......................................... 14

     A.    Plaintiffs Are Suffering Constitutional Injuries ..................................................... 14

     B.    There Is No Prospect of Collecting Debts From All Insolvent Individuals ............ 17

     C.    The CDC Abrogated Plaintiffs' Right To Control Their Property ......................... 18

   III.  IT IS NEVER IN THE PUBLIC INTEREST FOR A FEDERAL AGENCY TO ACT LAWLESSLY .......................................................................... 20

CONCLUSION .................................................................................................................. 20

CERTIFICATE OF SERVICE ........................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) ........................................................................4

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...................................................................16

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012)........................................................................20

*Brown v. Azar*,
    No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ....................5, 18–19

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ........................................................................1

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ...................................................................17

*Chevron, U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)...................................................................6

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ........................................................................10

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)...................................................................6

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................................7

*Deckert v. Indep. Shares Corp.*,
    311 U.S. 282 (1940)...................................................................18

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ...................................................................18

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020)...................................................................13

*E. Tennessee Nat. Gas Co. v. Sage*,
    361 F.3d 808 (4th Cir. 2004) ...................................................................19

*Elmsford Apt. Assocs., LLC v. Cuomo*,
    No. 20-CV-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ...........................................17

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................15

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)...................................................................16

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................................................20

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)...................................................................6

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)...................................................................19

*Hoxworth v. Blinder, Robinson & Co.*,
903 F.2d 186 (3d Cir. 1990)............................................................17

*Independent Turtle Farmers of Louisiana, Inc. v. United States*,
703 F. Supp. 2d 604 (W.D. La. 2010)..........................................3, 5

*Industrial Union Department, AFL-CIO v. American Petroleum Institute*,
448 U.S. 607 (1980)...................................................................9–10

*INS v. Chadha*, 462 U.S. 919 (1983) ...............................................20

*Iowa League of Cities v. E.P.A.*, 711 F.3d 844 (8th Cir. 2013) ................10

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014) ................20

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ...........................17

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)................................5–6, 12

*Louisiana Pub. Serv. Comm'n v. F.C.C.*,
476 U.S. 355 (1986)....................................................................15

*Luminant Generation Co. v. U.S. E.P.A.*, 675 F.3d 917 (5th Cir. 2012) ................14

*Marshall v. United States*, 414 U.S. 417 (1974).......................3

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...................................................15–16

*Minard Run Oil Co. v. U.S. Forest Serv.*,
670 F.3d 236 (3d Cir. 2011)...................................................18–19

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
760 F.2d 618 (5th Cir. 1985)...................................................15, 17

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...................................................................13–14

*New York Times v. Sullivan*, 376 U.S. 254 (1964)..........................16

*PDR Network LLC v. Carlton & Harris Chiropractic, Inc.*,
139 S. Ct. 2051 (2019)............................................................10–11

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)....................................................................10

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir. 1995) ........................................................17

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
822 F.2d 1390 (6th Cir. 1987) ...............................................15–16

*Professionals & Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995) ...........................................................11

*Roda Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ........................................................19

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ..........................................................17

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    No. 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020)........................1, 19

*RSR Corp. v. E.P.A.*, 588 F. Supp. 1251 (N.D. Tex. 1984) ....................13

*Springtree Apartments, ALPIC v. Livingston Parish Council*,
    207 F. Supp. 2d 507 (M.D. La. 2001)...............................................16

*Sw. Elec. Power Co. v. United States Envtl. Prot. Agency*,
    920 F.3d 999 (5th Cir. 2019) ..........................................................14

*Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986) ..................17

*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) ..............11

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) ............................11

*Touby v. United States*, 500 U.S. 160 (1991)..........................................9

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017)........1

*United States v. Hastie*, 854 F.3d 1298 (11th Cir. 2017)..........................5

*United States v. Johnson*, 632 F.3d 912 (5th Cir. 2011) ........................12

*United States v. Lopez*, 514 U.S. 549 (1995)..........................................7

*U.S. Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979) ..........................12

*Utility Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014)........................................................................2

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ........................................................15

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001)....................................................................8–10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................15

*Yates v. United States*, 574 U.S. 528 (2015)..........................................6

## Statutes

42 U.S.C. § 264(a) ................................................................ *passim*

    § 264(b).........................................................................................3

## Constitution

U.S. Const. art. I, § 1............................................................................12

**Regulation**

42 C.F.R. § 70.2 ...................................................................................................3–4, 11

**Other Authorities**

85 Fed. Reg. 55,292-01 (Sept. 4, 2020) ................................................................12, 14

Br. Amici Curiae, National Apartment Association, *et al.*,
  *Skyworks, Ltd. v. Centers for Disease Control and Prevention*,
  5:20-cv-02407-JRA (N.D. Oh. Nov. 17, 2020) ....................................................13

Restatement (Second) of Contracts (1981) ...............................................................17

Wright & Miller, *Fed. Pract. & Proc.* (3d ed. 2018) ................................................15

# INTRODUCTION

The Center for Disease Control and Prevention (CDC) has assumed the power to criminalize eviction proceedings throughout the nation. It asserts this power under a statute that authorizes the Department of Health and Human Services (HHS) and the CDC to take what Congress referred to as "ordinary disease control measures." The Government admits that the implication of the CDC's extraordinary assumption of power is that the CDC may control any human activity that could conceivably contribute to the spread of disease in America. And the CDC may exercise such authority, according to the Government, through the mere stroke of a bureaucratic pen, without even following the Administrative Procedure Act's (APA's) notice-and-comment rulemaking procedures.

This is not how lawmaking is supposed to be done under a Constitution that limits the power of the Federal Government and assigns to Congress the power to make law and to the executive branch the power only to enforce it. It is not even how rulemaking is supposed to be done under the APA, which was designed to ensure that administrative agencies, in wielding their vast power, at least give notice of the rules Americans must follow in advance and allow them an opportunity for input. "[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *3 (U.S. Nov. 25, 2020). This Court should enjoin the CDC's breathtaking exercise of authority it does not possess.[1]

---

[1] Plaintiff Chambless Enterprises has established standing to challenge the CDC Order. Accordingly, this Court need not consider whether the Apartment Association of Louisiana has standing. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) (affirming that the requirement of Article III is satisfied so long as one plaintiff has standing).

**ARGUMENT**

**I.  THE CDC EVICTION MORATORIUM IS UNLAWFUL**

    **A.  The CDC Order Exceeds Statutory Authority**

        **1.    Longstanding Canons of Construction Limit CDC's Discretion**

The CDC lacks authority to impose regulations that involve measures unrelated to "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles." 42 U.S.C. § 264(a). The Order does not resemble the actions in the enumerated list.

The Government emphasizes the sentence before this list, which authorizes the agency "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" into or among the states. 42 U.S.C. § 264(a); Defendants' Mem. in Opp. to Pls.' Motion for Prelim. Inj. at 15, ECF No. 20 ("Opp. Br."). According to the Government, the term "judgment" exhibits deference to the agency. But that first sentence must be read in context. *See Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014). The limits imposed on the agency in the second sentence relate back to the grant of power in the first sentence. The first sentence deals with the regulations that the agency can promulgate, while the second sentence deals with the measures that the agency may take in furtherance of those regulations. The types of measures that can be taken inform the types of regulations the agency may pursue. If, as the Government suggests, the enumerated list has no bearing on regulations that the CDC can impose, then the list is meaningless. The CDC Order is a prime example. How will fumigation, disinfection, sanitation, or destruction of infected animals help the CDC further the eviction moratorium? If the sentence regarding measures of enforcement is to have any meaning, it must relate back to the types of regulations that would require those kinds of measures as an effective means of administering the regulation.

Moreover, if at all lawful, the agency's Order must stem from the authority granted from the second sentence of Section 264(a) because the Government insists that the Order is *not* a regulation, but rather a measure taken to further regulation 42 C.F.R. § 70.2. *See* Opp. Br. at 29. Thus, the CDC Order is subject to the more limited authority granted in the second sentence of Section 264, not the first sentence authorizing the agency to adopt regulations. This is one among several reasons why *Independent Turtle Farmers of Louisiana, Inc. v. United States*, 703 F. Supp. 2d 604 (W.D. La. 2010), which the Government relies on, is inapposite; that case was a legal challenge to a regulation promulgated on the authority of the first sentence of 42 U.S.C. § 264(a), not a measure taken under the second sentence.

The agency also argues that subsection (a) of 42 U.S.C. § 264 must be read broadly because subsection (b) contemplates detention of individuals as a permissible measure, which is not akin to the enumerated list. But it is not subsection (a) that authorizes detention—that is what subsection (b) does. Subsection (b) states that the statute does *not* allow for detention except under circumstances established in subsection (b). 42 U.S.C. § 264(b). Thus, subsection (b) *creates* the power to detain, and the phrasing makes clear that the preceding subsection contemplates no such power.

The Government also asks this Court to relax its interpretive rigor because this statute touches upon an area "fraught with medical and scientific uncertainties." Opp. Br. at 15 (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). The case the Government cites for this proposition, *Marshall v. United States*, did not instruct courts to read technical statutes broadly. Rather, the case stated the age-old rule that judges should not second-guess the reasonableness of legislative line-drawing. *Id.* at 427–28.

The Government argues that the ejusdem generis canon does not apply. The Government points out that, in 42 C.F.R. § 70.2, the enumerated list comes after the catch-all phrase, arguing that the canon only applies where the catch-all phrase comes after the enumerated list. Opp. Br. at 20. But the statute's structure is the reverse: the catch-all follows the enumerated list, which is precisely the circumstance where ejusdem generis applies. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008). The Government likewise argues that the word "including" renders the surplusage canon obsolete, Opp. Br. at 20, but only the regulation uses that word, not the statute. To the extent that the regulation avoids ejusdem generis by its grammatical structure, it exceeds the scope of authority granted by the statute, and the Government has never asked this Court to defer to the regulation's interpretation of the statute.

The Government then argues that, even if ejusdem generis applies, the eviction moratorium is "not so different" from the enumerated list. Opp. Br. at 21. The Government artificially narrows the common attributes in the list, focusing on the notion that each action involves some property intrusion. *Id.* But the Government fails to acknowledge that the statute imposes additional limits where the restrictions on property are heightened. Thus, for instance, the statute only allows for outright destruction of property if the agency makes an express finding that the particular property at issue poses a substantial health risk. *See* 42 U.S.C. § 264(a). These requirements are not imposed for lesser intrusions, such as fumigation. The CDC Order does not make any particularized finding for the individual properties subject to the Order.

Further, the Government ignores other common attributes in the enumerated list, such as conventional methods of disease prevention and localized actions that take place at specific sites and directly mitigate spread of disease. The list, moreover, does not involve actions that curtail or control human behavior or that bar people from exercising rights granted by their respective states.

4

The CDC Order differs on each of these common attributes: it is unconventional (indeed, unprecedented), it is a nationwide rather than localized effort, it does not just act on a particular piece of property but limits human action by preventing landlords from going through the eviction process, and it only strikes at disease indirectly, by potentially preventing homelessness, which could potentially lead to more congregating, which could potentially lead to transmission, which could potentially cross a border. The CDC Order is much less akin to the enumerated list than the agency regulation in *Independent Turtle Farmers*, 703 F. Supp. 2d 604. There, the regulation banning sale of pet turtles due to salmonella risks did not abrogate a preexisting statutory right, did not thwart rights in real property, did not meddle with a massive swath of American economic life, and was closely related to destruction of infected animals.

The Government also points to a recent federal district court ruling rejecting statutory arguments similar to those raised by Plaintiffs here. *See Brown v. Azar*, No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020). But the district court made several key interpretive errors. First, the court made the same error mentioned above—assuming that subsection (a) authorizes detention when it does not. *Id.* at *8. Second, the court dismissed the enumerated list, citing a case that states "[t]he word *include* does not ordinarily introduce an exhaustive list." *Id.* (quoting *United States v. Hastie*, 854 F.3d 1298, 1304 (11th Cir. 2017)). But no one is arguing that the enumerated list is exhaustive, only that it guides the meaning of "other measures." Moreover, the word "include" does not appear in the statute.

Finally, the district court erred in holding that ejusdem generis and similar canons do not apply because the statute is not ambiguous. *Id.* at *9. Yet a court can only conclude a statute is ambiguous *after* employing the traditional canons of construction. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (noting that, for both rules and statutes, ambiguity only arises "*after* a court has

resorted to *all* the standard tools of interpretation") (emphasis added); *id.* at 2415 ("[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."); *Chevron, U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) (a statute is not ambiguous "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue"). *See also, e.g.*, *Yates v. United States*, 574 U.S. 528, 537 (2015) (applying ejusdem generis before determining whether the text was ambiguous); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–20 (2001) (same). Hence, the court erred in declining to apply these canons.

    **2.**     **The Federalism and Constitutional Avoidance Canons Call for Rejection of CDC's Sweeping Assertion of Power**

        **a.**     **The Statute Does Not Contain a Clear Statement That Congress Intended To Encroach Upon State Prerogatives**

Federal courts presume that Congress did not intend to step into traditional areas of state concern unless Congress says so in unmistakably clear terms. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Here, the statute states that the CDC may prevent disease through conventional disease control measures. There is not a whisper about congressional intent to exercise control over state court proceedings or state landlord-tenant law.

The Government points out that federal law preempts state law, which has no bearing on the federalism canon. Indeed, federal preemption is one reason courts hesitate to interpret uncertain language as overriding state prerogatives. The Government also points out that the Federal Government has often regulated the rental industry in the past. Once again, this point has no bearing on whether *this* statute presents a clear intent to do so, except to the extent that it shows that Congress knows how to legislate in the rental industry, only reaffirming that Congress can be clear about its intentions.

The Government next argues that a federal order barring landlords from accessing state court proceedings does not actually alter the federal-state balance. But there is no question that Plaintiffs in this matter, as well as landlords across the country, would be able to avail themselves of state statutory remedies but for the CDC Order. Moreover, the Government implies that it has authority to engage in the police power actions that states have taken during the pandemic, such as stay-at-home orders and business closures. *See* Opp. Br. at 22. The Government cannot claim to arrogate to itself a federal police power while disclaiming any intent to step on state authority. *See United States v. Lopez*, 514 U.S. 549, 567–68 (1995).

### b.   This Court Should Employ Constitutional Avoidance

The Government urges this Court to ignore the constitutional avoidance canon because the statute is not ambiguous. But the canon applies so long as there is more than one plausible reading of the statute. *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). Plaintiffs need not rehash the interpretive analysis to demonstrate that the statute has a plausible reading that avoids constitutional issues.

 Non-delegation concerns are discussed below. The Government dismisses Commerce Clause concerns by misconstruing what the Order regulates. The Order only regulates a landlord's access to a state court proceeding, not the general commercial activity of renting property. It bears repeating that the Government frankly admits that it believes the statute gives it the power to adopt any measures that states have taken pursuant to their police powers, Opp. Br. at 22, indicating that the Government's view of the statute gives it the very federal police power that the Supreme Court has consistently rejected as within the ambit of the Commerce Clause. *See Lopez*, 514 U.S. at 567.

### B.   The Government's Interpretation Violates the Non-Delegation Doctrine

The Government contends that the statute grants it the sweeping authority to ban evictions across the nation. The Government points to three supposed intelligible principles: (1) the

requirement that CDC action be geared toward preventing communicable disease; (2) that such action be judged necessary by the CDC; and (3) that the CDC condition its actions on a finding that state actions are insufficient. Opp. Br. at 28.

The statute's authorization for the CDC to prevent spread of disease is not an intelligible principle. This only establishes the subject matter area in which the agency can regulate. As Plaintiffs explained in their memorandum, any human interaction involves a risk that an illness might spread. Hence, aside perhaps from long-distance communication, all human interactions are within the scope of this mandate.

The requirement that such action be deemed "necessary" based on the agency's "judgment" is likewise no intelligible principle. The use of the word "judgment" is telling—the determination of necessity sits entirely within the agency's discretion, and it may consider whatever factors and weigh whatever considerations it deems relevant to that determination. No statutory criteria exist to guide the agency's necessity determination.

The Government also points to the requirement in the regulation that the CDC may only act where it deems state action to be insufficient. But limits imposed by regulation are irrelevant to the non-delegation analysis, which focuses on what the legislature authorized the agency to do, not what limits the agency voluntarily imposed on itself: "Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001).

The Government relies on cases that only demonstrate the distance between the statute as understood by the CDC and the statutes upheld in the cited cases. In *Whitman*, for instance, the Supreme Court upheld EPA authority to set national ambient air quality standards. But the agency's determination of what was "requisite" for air quality standards had to be based on

statutory air quality criteria reflecting the latest scientific knowledge. *Id.* No similar statutory criteria must be considered in determining what is "necessary" under 42 U.S.C. § 264(a).

Moreover, *Whitman* recognized that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Id.* Setting air quality standards involved "judgments of degree" somewhere along a single public safety continuum. *Id.* at 475. By contrast, the CDC claims a broad, roving authority to alter the very substance of American life and restrict any activity that could risk disease transmission, including through stay-at-home orders and business closures. Opp. Br. at 22.

The other cases relied on by the Government involve statutes that, like the statute in *Whitman*, impose statutory criteria on the agency's determination of necessity and involve a much narrower scope of power. For example, in *Touby v. United States*, 500 U.S. 160, 166 (1991), the Attorney General had authority to temporarily mark drugs as controlled substances if he found it "necessary to avoid an imminent hazard to the public safety." But in making that determination, the Attorney General had to consider three factors: pattern of abuse, severity of abuse, and risk to public health. *Id.* These statutory factors limited the Attorney General's discretion, and his authority was relatively narrow in scope: he could only temporarily insert specific substances into a preexisting statutory regime. No similar temporal or subject-matter limit exists with respect to the CDC's claimed authority.

Again, in *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980), the Occupational Safety and Health Act gave OSHA power to set standards for toxic materials, but constrained that discretion by imposing a feasibility standard, a cost-benefit analysis, a required finding of "significant risk," and a "best available evidence" standard. *Id.* at 644–45. Indeed, the Court in *Industrial Union* rejected a broad reading of the statute that would

9

not require the agency to quantify the public safety risk because such a reading would pose a serious non-delegation problem. *Id.* at 646. The Court refused to give the agency "the unprecedented power over American industry that would result from the government's view." *Id.* at 645. This Court should likewise reject the Government's view that would give the CDC not only unprecedented power over American industry, but power even to dictate American social life with as much discretion as any state legislature.

The statute at issue here, as understood by the Government, imposes none of the constraints that the Court considered important in the cited cases. There is no feasibility standard, no "significant risk" requirement, no list of statutory criteria to consider, no cost-benefit analysis, no "best available science" standard. And the scope of the power CDC seeks is broader than the statutes in the above cases. One could paraphrase *Whitman* as follows: "[42 U.S.C. § 264(a)] has conferred authority to regulate the entire economy on the basis of no more precise a standard than [preventing transmission of disease that the agency deems 'necessary' based on its own unencumbered 'judgment']." *Whitman*, 531 U.S. at 474.

**C.    The CDC Order Is a Legislative Rule Subject to Notice-and-Comment**

The APA's notice-and-comment requirement serves the vital functions of accountability and transparency.[2] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). It ensures that those affected by agency actions will have a meaningful opportunity to participate in the process. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979). The CDC's eviction moratorium unquestionably fits the definition of a legislative rule, as it is a statement of general applicability that carries the force of law and affects the rights of potentially millions of Americans. *See PDR*

---

[2] It bears emphasis that the injury suffered with a notice-and-comment violation is in the regulatory burden of complying with an improperly promulgated rule. *See  Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 870–71 (8th Cir. 2013) (recognizing the compliance costs as the relevant injury).

*Network LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019). And it does not fit the narrower definition of an "order" because it is not an individualized directive that merely applies a general rule. *See id.* (recognizing that an FCC pronouncement interpreting the Telephone Consumer Protection Act constitutes a *rule* for the purposes of the APA, even as it was deemed an order for the purposes of the Hobbs Act).

The Government's only response is that it would be odd if the CDC had to follow notice-and-comment rulemaking every time it issued an order under Section 70.2. Opp. Br. at 31. Indeed, that would be odd if the subject were fumigating railcars or banning infected turtles or engaging in some other action clearly contemplated by Section 264(a) or 70.2. But it is far from odd to expect an agency to follow notice-and-comment rulemaking when it is altering the rights of millions and criminalizing a legal process available in every state. The Government's point only emphasizes that Congress could not have intended to give HHS or CDC the sweeping authority they have claimed. When Congress passed an eviction moratorium in the CARES Act, it did so in the light of day through the normal lawmaking process. If the CDC can accomplish the same thing behind closed doors with a bureaucratic stroke of the pen, then the APA's notice-and-comment procedures (to say nothing of Congress's lawmaking authority) is a dead letter. *See Texas v. United States*, 201 F. Supp. 3d 810, 829 (N.D. Tex. 2016) (emphasizing that the purpose of the APA's notice-and-comment requirement is to encourage more thoughtful rulemaking).

The existence of the CARES Act eviction moratorium also serves as a rejoinder to the Government's claim that following notice-and-comment rulemaking would have been impracticable. Opp. Br. at 29–31. *Cf. Texas v. United States*, 787 F.3d 733, 762 (5th Cir. 2015) (stressing that "APA's notice-and-comment exemptions must be narrowly construed") (quoting *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)).

11

Congress knew early in the pandemic that evictions were likely and managed to adopt a moratorium on March 27, 2020, that was set to expire in July. The CDC knew all this, yet it claims that it could only act on an "emergency" basis in late August. This is not a credible reason to ignore notice and comment. *See United States v. Johnson*, 632 F.3d 912, 929 (5th Cir. 2011) (holding that there was not good cause for bypassing notice and comment where an agency waited seven months from the triggering event). *See also U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (stressing the good cause exception should not be used "to circumvent the notice and comment requirements…"). Nor can the expiration of the CARES Act moratorium constitute an "emergency." That was a legislative choice, exclusively within Congress' power to make. *See* U.S. Const. art. I, § 1. If legislative choices were an excuse to ignore notice-and-comment requirements, agencies could concoct emergencies out of the expiration of virtually any law.

### D.    The CDC Order Was Arbitrary and Capricious

By its own account, the CDC rushed to issue the eviction moratorium. Opp. Br. at 30. In its haste, the CDC neglected to engage in the sort of thorough and deliberative analysis that we should expect for a "major rule." 85 Fed. Reg. 55,292-01, 55,296 (Sept. 4, 2020). For that matter, the Government acknowledges that the CDC's Order is predicated upon speculative assumptions. Opp. Br. at 31 (claiming that deference is owed when an agency makes predictions). But no deference is owed to unsupported factual assertions, especially where an agency lacks special expertise. *Cf. Kisor*, 139 S. Ct. at 2417 (deference is inappropriate if the agency lacks special expertise). Here the Government stresses that the CDC relied on a finding that "30-40 million people in America *could* be at risk of eviction." 85 Fed. Reg. at 55,295 & n.17 (emphasis added). Granted, *some* nonpaying tenants would face eviction in the absence of a nationwide moratorium; however, the Government has failed to identify anything in the record demonstrating that *mass evictions* were likely. *See* Declaration of Erin Babich Runge, Exhibit A (observing that there has

Case 3:20-cv-01455-TAD-KDM   Document 32-1   Filed 12/14/20   Page 19 of 27 PageID #:  440

not been a dramatic uptick in eviction filings). The Government responds that the CDC could not be expected to "obtain[] the unobtainable." Opp. Br. at 31. Yet if the CDC had proceeded in a reasoned and deliberative rulemaking process, it would have engaged in comparative analysis between states with eviction moratoria and those without. In failing to do so, the CDC "failed to consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto*, 463 U.S. 29, 43 (1983); *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1912, (2020) (Attorney General failed to sufficiently explain a change in policy).

Further, the Government argues that there was no need to consider whether the eviction moratorium might make it more difficult for individuals with poor credit to secure housing because—while the CDC's public health goal was to enable people to shelter in place—it sought only to "keep existing renters from being dislocated and moving. . . ." Opp. Br. at 32. If so, then the CDC "failed to consider an important aspect of the problem," and the Order is therefore arbitrary and capricious. *RSR Corp. v. E.P.A.*, 588 F. Supp. 1251, 1255 (N.D. Tex. 1984) (agency failed to show that its decision was based on consideration and examination of all relevant factors and alternatives) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). Whether because a lease expires or because an individual seeks to relocate to pursue a new job, people must inevitably seek out new housing—even during a pandemic. What is more, had the CDC provided a comment period, it would have learned that an eviction moratorium would prompt some landlords to exit the rental market entirely, therein "limit[ing] the availability of rental units for everyone." *See* Br. Amici Curiae, National Apartment Association, *et al*. at 12–14, *Skyworks, Ltd. v. Centers for Disease Control and Prevention*, No. 5:20-cv-02407-JRA (N.D. Ohio Nov. 17, 2020), ECF No. 20.

Lastly, the Government argues that it is within the discretion of the CDC's "expert judgment" to craft an eviction moratorium in whatever manner the agency deems fit. Opp. Br. at 32. But whatever latitude the CDC might have, the Government acknowledges that the APA forbids decisions that "run[] counter to the evidence before the agency . . . ." *Luminant Generation Co., LLC v. U.S. E.P.A.*, 675 F.3d 917, 925 (5th Cir. 2012) (quoting language from *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43); *see Sw. Elec. Power Co. v. United States Envtl. Prot. Agency*, 920 F.3d 999, 1016 (5th Cir. 2019) (finding "critical tension" between EPA's findings and its ultimate decision). Here the Government has failed to reconcile the facts that the CDC relied upon with its decision to issue the *temporary* halt in evictions. The Order contemplated that a moratorium was necessary to prevent evictions through the colder months and during the flu season. 85 Fed. Reg. at 55,296. Yet, without explanation, the CDC set its moratorium to expire during the height of flu season and during the first month of winter.[3] *Motor Vehicle Mfrs.*, 463 U.S. at 48 (stressing "an agency must cogently explain why it has exercised its discretion in a given manner"); *id.* at 43 (agency must sufficiently "examine the relevant data").

## II.  PLAINTIFFS ARE SUFFERING IRREPARABLE HARM

### A.  Plaintiffs Are Suffering Constitutional Injuries

The CDC has asserted the power to alter the contractual rights of landlords throughout the nation and to criminalize an entirely legal means of protecting those rights under state law. As Plaintiffs have demonstrated above, the CDC does not possess that breathtaking authority. The Government characterizes this as a mere statutory dispute and contends, on that basis, that even if

---

[3] The Government's only response is that it *might* extend the moratorium at its discretion. But viewed together with CDC's snap judgment to issue the Order in September—without even enough time for a 30-day public comment period—and its assertion that it may consider extensions without setting forth a framework for that analysis, CDC's "touch and go" approach is unpredictable and arbitrary on the whole.

Plaintiffs are correct, they cannot show that the CDC's illicit assumption of power causes them irreparable harm. Opp. Br. at 10–11. But the CDC has not merely violated a statute, it has usurped Congress' power to make law. As the Supreme Court has made clear, "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374–75 (1986). Where an agency acts without congressional authorization, it necessarily violates the Constitution, for "[a]n agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Id*. And granting an agency the power to override Congress would be a clear violation of the separation of powers.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"[4] *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). *See also Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 630 n.12 (5th Cir. 1985) (recognizing that deprivation of constitutional rights is irreparable harm); 11A Wright & Miller, *Fed. Pract. & Proc.* § 2948.1 (3d ed. 2018) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."). According to the Government, this principle applies only where First Amendment rights or the right to privacy are at stake. Opp. Br. at 10. But this is not so. *See, e.g.*, *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1055–56 (5th Cir. 1997) (violation of due process rights constitutes irreparable harm); *Planned Parenthood*

---

[4] The Government is correct that *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) does not support the proposition that where constitutional claims are alleged, courts presume irreparable harm. Plaintiffs regret the error. Plaintiffs' burden, instead, is to show a likelihood of irreparable harm. *Id*. at 22.

*Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (same); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (violation of Dormant Commerce and Supremacy Clauses caused irreparable harm); *Melendres*, 695 F.3d at 1002 (violation of Fourth Amendment rights constitutes irreparable harm). *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992) (noting that obeying an unconstitutional law causes a party injury); *Springtree Apartments*, *ALPIC v. Livingston Parish Council*, 207 F. Supp. 2d 507, 515 (M.D. La. 2001) (finding irreparable harm under the Fifth and Fourteenth Amendments where parish enforced an ordinance against a landowner that did not apply to the properties at issue).

The Supreme Court has repeatedly held that the separation of powers protects individual liberty. *See* Plaintiffs' Mem. in Support of Motion for Prelim. Inj. at 25–26 (citing cases). It follows that a violation of the separation of powers—such as the CDC's exercise of the power to make law at issue in this case—constitutes irreparable harm. It would be bizarre, to say the least, if the principle were otherwise and a violation of the right to free speech constituted irreparable harm but a violation of the core animating principle of our Constitution did not. After all, one of the purposes of the right to free speech is to ensure that government remain "responsive to the will of the people." *New York Times v. Sullivan*, 376 U.S. 254, 301 (1964). This is, of course, a key purpose of the separation of powers as well. *See, e.g.*, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) (stating that separation of powers ensures that government remain accountable to the people). If the Government were correct, it would constitute irreparable harm to prevent Plaintiffs from talking about the separation of powers, but the courts would be entirely justified in shrugging off an actual violation of that principle.

**B.  There Is No Prospect of Collecting Debts From All Insolvent Individuals**

The Government contends that there is no irreparable harm because Plaintiffs *might* be able to collect on back-rent at some later point. But, if we take seriously the sworn statements in the Renter Declarations, then the tenants are necessarily insolvent because they've attested to the fact that they cannot meet their contractual obligations. This point distinguishes *Elmsford Apt. Assocs., LLC v. Cuomo*, No. 20-CV-4062, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020). In *Elmsford* the plaintiffs challenged a state eviction moratorium where there was no requirement that the tenant attest to insolvency. While the Order theoretically permits landlords to pursue back-rent and late fees, the reality is that landlords cannot collect from insolvent tenants. And if there is no meaningful prospect of collecting from nonpaying tenants then there is necessarily irreparable harm. *See Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (finding that damages are irreparable if assets needed to pay damages are likely to dissipate); *Mississippi Power & Light*, 760 F.2d at 630 n.12 (where a party is "unable to respond in damages") (citing Restatement (Second) of Contracts §§ 359(1), 360 (1981)). *See also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (recognizing irreparable harm where it would be difficult to ensure that a plaintiff would be fully compensated); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (recognizing irreparable harm where a "defendant is likely to be insolvent at the time of judgement") (quoting *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986) (same); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (same). *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990) (recognizing that the possibility of an unsatisfied money judgment may establish irreparable injury).

The Government implies that the tenants may be lying. Opp. Br. at 13. But this is a peculiar position for the Government to be taking when the CDC's Order states that a tenant may invoke

the protections of the moratorium by submitting their sworn declaration that they cannot pay rent. It smacks of gamesmanship for the Government to now argue that landlords—and presumably local courts—should assume that many tenants are simply taking advantage of the moratorium. And the Government does not explain how a landlord is supposed to know whether a tenant is hiding assets or is otherwise capable of paying when they have sworn otherwise. In any event, local courts are doing precisely what one would expect—and what the CDC obviously intended when it issued the order: they are accepting tenant declarations at face value and preventing evictions. Declaration of Joshua Chambless ¶¶ 7-12.

Nonetheless the Government speculates that these insolvent tenants *might* recover financially by the time a landlord should obtain judgment in a collection action. Yet there is no basis for assuming an insolvent individual will see a dramatic change in fortunes. Aside from the Northern District of Georgia's decision in *Brown*, 2020 WL 6364310, nothing in the Government's cited cases supports the proposition that an insolvent individual is likely become solvent going forward. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (no finding of insolvency). The *Brown* decision is flawed because it assumes that an insolvent tenant is likely to receive a windfall. *See Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that a preliminary injunction was appropriate because there were "allegations" of insolvency).

## C.  The CDC Abrogated Plaintiffs' Right To Control Their Property

The Government argues that only a permanent deprivation of real property constitutes irreparable harm. Opp. Br. at 11–12. The Government provides no citation for this proposition aside from the Northern District of Georgia's decision in *Brown,* which balked only at assuming a categorical rule that any impingement of property rights is irreparable. The decision in *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011), provides no support for

18

Defendants' cramped view of irreparable harm. *Minard Run Oil Co.* recognized that a plaintiff may establish irreparable harm when denied immediate use of real property. Moreover, the Government fails to reconcile other cases that recognize irreparable harm where there the property interest is subject to neither permanent deprivation nor destruction. For example, in *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009), real estate investors were held to have suffered irreparable harm in a suit against an investment manager because they were "miss[ing] opportunities." Likewise, in *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, (4th Cir. 2004), the Fourth Circuit recognized that there was irreparable harm in denying plaintiffs the right of immediate use of real property, even where the injury complained of was principally economic. *Id*. at 828–29.

## III.   IT IS NEVER IN THE PUBLIC INTEREST FOR A FEDERAL AGENCY TO ACT LAWLESSLY

The Government asserts that the public interest favors allowing for the continued enforcement of the CDC Order—even if Plaintiffs are correct that it violates the Constitution, was promulgated without statutory authority, and/or in violation of the APA. Opp. Br. at 33–34. Notably, *Brown* was wrongly decided to the extent it contradicts the U.S. Supreme Court's recent holding, which unequivocally repudiated the idea that "the Constitution can be put away and forgotten" during a pandemic. *Cuomo*, 2020 WL 6948354, at *3.[5] *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.").

---

[5] The Government also points to a string of cases where the courts concluded it was not in the public interest to issue a preliminary injunction. But, tellingly, in all those cases plaintiffs were unlikely to prevail on the merits. The converse is true here. Because Plaintiffs are likely to prevail on the merits, the public interest factor necessarily weighs in their favor.

It can never be in the public interest to take actions that have not been authorized by Congress because ultra vires regulation violates the will of the governed. *See INS v. Chadha*, 462 U.S. 919, 951–52 (1983) (defining the Legislature's constitutional authority). For that matter, it can never be in the public interest to allow continued enforcement of a rule that violates the Administrative Procedure Act because, with enactment of the APA, Congress decided that adherence to notice-and-comment procedures served vital public functions. And it can never be in the public interest for government to violate separation of powers because the Constitution represents the "ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted.

DATED: December 14, 2020.

Respectfully submitted,

/s/ STEVEN M. SIMPSON
STEVEN M. SIMPSON*
DC Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org

/s/ JAMES C. RATHER, JR.
JAMES C. RATHER, JR.
Louisiana Bar No. 25839
ALKER & RATHER, LLC
4030 Lonesome Rd., Suite B
Mandeville, LA 70448
Tel: (985) 727-7501
JRather@alker-rather.com

LUKE A. WAKE*
DC Bar No. 1009181
ETHAN W. BLEVINS*
Washington State Bar No. 48219
HANNAH SELLS MARCLEY*
Washington State Bar No. 52692
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Tel: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org
EBlevins@pacifclegal.org
HMarcley@pacificlegal.org
*Pro hac vice*

*Attorneys for Plaintiffs*

20

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon counsel of record.

By */s/* STEVEN M. SIMPSON
  STEVEN M. SIMPSON