# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

CHAMBLESS ENTERPRISES, LLC, ET AL.          CIVIL ACTION NO: 3:20-cv-01455

VERSUS                                      JUDGE TERRY A. DOUGHTY

ROBERT REDFIELD, ET AL.                     MAG. JUDGE KAREN L. HAYES

## RULING

Pending here is a Motion for Preliminary Injunction [Doc. No. 5] filed by Plaintiffs Chambless Enterprises, LLC ("Chambless") and Apartment Association of Louisiana, Inc. ("AAL") (collectively "Plaintiffs").

Defendants Centers for Disease Control and Prevention ("CDC"); Robert R. Redfield as the Director of the CDC; Nina B. Witkofsky as the Acting Chief of Staff for the CDC; Alex Azar as the Secretary of Health and Human Services ("HHS"); the HHS; and William P. Barr as the Attorney General of the United States and the head of the Department of Justice (collectively "Defendants") have filed an opposition [Doc. No. 22].

A Brief of *Amici Curiae* in support of Defendants has been filed by the American Academy of Pediatrics; the American Medical Association; Children's Healthwatch; the George Consortium; GLMA: Health Professionals Advancing LGBTQ Equality; Louisiana Fair Housing Action Center; National Hispanic Medical Association; National Medical Association; Public Health Law Watch; Emily A. Benfer; Matthew Desmond; Gregg Gonsalves; Peter Hepburn; Danya A. Keene; Kathryn M. Leifheit; Michael Z. Levy; Sabriya A. Linton; Craig E. Pollack; Julia Raifman; Gabriel L. Schwartz; and David Vlahov [Doc. No. 28].

A Brief of *Amici Curiae* in support of Defendants has also been filed by Southeast Louisiana Legal Services and Acadiana Legal Service Corporation (collectively "Legal Services") [Doc. No. 31].

Plaintiffs have filed a reply to the opposition [Doc. No. 32].

For the following reasons, the Motion for Preliminary Injunction [Doc. No. 5] is DENIED.

## I.      FACTS AND PROCEDURAL BACKGROUND

The United States is affected by a global pandemic, during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the deaths of more than 280,000 people within our borders. *See Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19,* 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020). The disease spreads easily between persons within close contact. *Id*. It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic--meaning that infected persons have the potential to infect others unknowingly. *Id*. Despite drastic measures by federal, state, and local governments, COVID-19 continues to spread. *Id*.

As a result of the pandemic, "Federal, State, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria." *Id*.  This case involves one of those measures—eviction moratoria for certain qualifying individuals.

On September 4, 2020, the CDC, a division of the HHS, implemented a temporary eviction moratorium to prevent the further spread of COVID-19 (the "Order"). *Id*. While the Order is in place (September 4, 2020, through December 31, 2020, unless extended, modified or rescinded), landlords are prohibited from evicting a covered person from a residential property

for the non-payment of rent. *Id.* at 55,292; 55,297.  The CDC found that this moratorium is an effective public health measure because, among other things, it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move into congregate settings. *Id.* at 55295–96.

The Order does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction. *Id.* at 55292. Nor does it prevent landlords from evicting tenants for reasons other than failure to pay rent, such as criminal activity or property damage. *Id.* at 55294.

To qualify as a covered person, the individual tenant must provide a declaration to his or her landlord under penalty of perjury indicating that: (1) "[t]he individual has used best efforts to obtain all available government assistance for rent or housing"; (2) the individual satisfies certain income requirements; (3) "the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses"; (4) "the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses"; and (5) "eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options." *Id.* at 55,293.

Plaintiffs are a residential landlord and an association of residential landlords who seek to invalidate the Order.  On November 12, 2020, Plaintiffs brought this action against Defendants [Doc. No. 1].  The instant Motion for Preliminary Injunction was also filed on November 12,

2020 [Doc. No. 5].  Plaintiffs ask the Court to set aside the Order's temporary eviction moratorium and to forbid Defendants from enforcing it [Doc. No. 1, p. 17].

Defendants contend in their opposition that Plaintiffs have not shown a likelihood of success on the merits or irreparable injury.  Defendants further contend that the balancing of the harms favors Defendants and that the injunction is contrary to the public interests.

The Brief of *Amici Curiae* filed by the American Academy of Pediatrics, et al., argues that mass evictions are likely in Louisiana and nationwide without the Order, that eviction moratoriums slow the spread of COVID-19 and prevent negative short- and long-term health outcomes, and that eviction and COVID -19 disproportionately harm marginalized groups. [Doc. No. 28].

The Brief of *Amici Curiae* filed by Legal Services argues that weighing the public interest and balance of hardships requires considering what will happen to the tenants protected by the Order, and additionally gives examples of Legal Services clients who have avoided or delayed eviction and all of its adverse impacts as a result of the Order. [Doc. No. 31].

The issues are fully briefed, and the Court is prepared to rule.

## II.    ANALYSIS

In order to obtain a preliminary injunction, the party seeking the injunction must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir. 2013). "A preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried

the burden of persuasion on all four requirements." *Bluefield Water Ass'n v. City of Starkville,* 577 F.3d 250, 253 (5th Cir. 2009).

The Court will discuss each of these elements in turn.

### A.      Substantial Likelihood of Success on the Merits

In their Motion for Preliminary Injunction, Plaintiffs make three claims.  First, Plaintiffs contend the Order exceeds the CDC's statutory and regulatory authority.  Second, Plaintiffs assert that, if the statute can be read broadly enough to authorize an eviction moratorium, then it violates the non-delegation doctrine. Third, Plaintiffs argue that the Order violates the Administrative Procedure Act ("APA").

### 1.      Statutory and Regulatory Basis

Plaintiffs argue that the Order exceeds the CDC's statutory and regulatory authority. More specifically, Plaintiffs contend the Order exceeds the authority granted by 42 U.S.C. § 264 and 42 C.F.R. § 70.2, which, they assert, limit the CDC to control the interstate spread of disease by conventional, specific, disease-prevention measures, such as disinfection, fumigation, and pest extermination, that do not involve extensive control over human activity.  Plaintiffs state the laws do not authorize an action as extraordinary and unexpected as a nationwide ban on evictions.

Plaintiffs assert that canons of statutory construction illustrate that the statute and regulation cannot be interpreted broadly enough to authorize a nationwide eviction moratorium. They assert that Section 264(a) lists permissible agency actions to prevent disease transmission, and that list offers a window into the kinds of action that Congress envisioned: "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and

other measures, as in [the agency's] judgment may be necessary." 42 U.S.C. § 264(a). The "other measures," under *ejusdem generis* and *noscitur a sociis*, Plaintiffs argue, are limited to the types of action akin to the list that precedes it: conventional, localized disease-prevention measures directly aimed at prevention of interstate transmission, which do not involve substantial control over human activity.

Under *ejusdem generis*, a general term following an enumerated list is limited to those things related in kind to the list: "[W]hen a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 223 (2008) (internal quotation marks omitted) (quoting *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991)). Similarly, under *noscitur a sociis*, or the associated-words canon, words in a list are interpreted to have a similar meaning because they are associated in a similar context. *See Yates v. United States*, 574 U.S. 528, 544 (2015) (applying both *noscitur a sociis* and *ejusdem generis* in the interpretation of a criminal statute); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199–213, 107–11, 195–98, 93–100, 174–79 (Thompson/West 2012).

Plaintiffs argue that these canons of construction limit the CDC's discretion. Plaintiffs state that nothing in the list suggests that the CDC is allowed to control the contractual relationships of potentially millions of Americans, or the legal processes in every municipality in the nation. They further argue that the list contemplates actions limited to specific sites, objects, or animals that are, or could be, infected with a disease.

Plaintiffs contend that courts can employ a variety of canons of construction to avoid imputing to Congress intentions that may clash with important policy or legal standards unless Congress has spoken with a high degree of clarity. These include the federalism canon, the

constitutional-avoidance canon, and the rule of lenity.  They argue that all three canons favor a reading of the statute that would not authorize the sweeping power wielded by the CDC.

The federalism canon provides that, where a court faces multiple "plausible interpretations" of a statute, "the proper course [is] to adopt a construction which maintains the existing balance" between federal and state power "absent a clear indication of Congress' intent to change the balance." *Salinas v. United States*, 522 U.S. 52, 59 (1997).   Here, Plaintiffs argue, Section 264 lacks the clear intent by Congress to override state prerogatives in contract or property law.

The constitutional-avoidance canon provides that courts must prefer a reasonable reading of a statute that avoids serious constitutional concerns.  Plaintiffs assert that any reading of the statute that would authorize a nationwide ban on evictions raises serious constitutional concerns under the non-delegation doctrine, the Commerce Clause, and the Tenth Amendment.   A non-delegation concern arises because a broad reading of the statute leaves the CDC without any intelligible principle to guide the agency's discretion.  A Commerce Clause concern arises because the statute as interpreted by the CDC would create a federal police power, allowing a federal agency to control activity on a nationwide basis, however distant its impact on interstate commerce.  Such a federal police power would likewise run afoul of the Tenth Amendment.

Plaintiffs conclude that the CDC's action—banning evictions nationwide—is not related in kind to the list of actions permitted under the statute or regulation. It does not fit within a conventional understanding of typical disease control measures. It is a sweeping, nationwide action, not limited to specific hot spots. It is not an action aimed directly at the prevention of disease—rather, it deals with matters that are several causal steps removed from the spread of disease. And, unlike the traditional disease mitigation measures listed, the CDC order is a

breathtaking exercise of control over human activity. Given how far removed the CDC's action is from the list of activities contemplated by Congress, Plaintiffs argue that the CDC Order cannot be authorized by the statute.

Defendants, on the other hand, argue that the Order falls within the CDC's broad authority, that canons of construction do not negate Congress's clear intent, and that the interpretive presumptions to which Plaintiffs point do not apply.

The issue here, then, is whether the CDC had the statutory and regulatory authority to temporarily halt evictions for certain covered persons.   The Order in this case was issued pursuant to 42 U.S.C. § 264 and 42 C.F.R. § 70.2, and, thus, discussions of both are necessary to determine whether the CDC had a statutory and regulatory basis for issuing the Order. Title 42 United States Code Section 264(a) authorizes the Secretary of the HHS to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States ... or from one State ... into any other State." The statute then states that for purposes of carrying out and enforcing such regulations, the Secretary of the HHS "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id*.

 In turn, the Secretary of the HHS delegated authority to the Director of the CDC. Title 42 Code of Federal Regulations Section 70.2 states that whenever the Director of the CDC determines that the measures taken by the health authorities of any state or local jurisdiction are insufficient to prevent the spread of a communicable disease, "he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection,

8

fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."

This Court finds that the plain text of the statute is unambiguous and evinces a legislative determination to defer to the "judgment" of public health authorities about what measures they deem "necessary" to prevent contagion. Congress's use of the phrase "such regulations as in his judgment are necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). And the Supreme Court has recognized that similar congressional delegations of authority that empower agencies to take actions that are "necessary" provide "broad power to enforce all provisions of [a] statute." *Gonzalez v. Oregon*, 546 U.S. 243, 258–59 (2006); *see also, e.g., Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 980–81 (2005) (statute permitting agency to "prescribe such rules and regulations as may be necessary in the public interest" undisputedly provided agency authority to promulgate order.) (citation omitted)).

The Supreme Court has specifically explained that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad, and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974). "Congress' intent, as evidenced by the plain language of the delegation provision, is clear: Congress gave the Secretary of HHS broad power to issue regulations necessary to prevent the introduction, transmission or spread of communicable diseases." *Brown v. Azar*, No. 1:20-CV-03702, 2020 WL 6364310, at *7, (N.D. Ga. Oct. 29, 2020); *see also Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977) (in 42 U.S.C. § 264, "Congress

has granted broad, flexible powers to federal health authorities who must use their judgment in attempting to protect the public against the spread of communicable disease.").

As indicated above, Plaintiffs argue that the second sentence of § 264(a) operates to limit the Secretary of the HHS' authority to just those (or similar) measures. The Court finds, however, that the examples Congress gave of specific measures the Secretary may take to control infectious disease—which are illustrative, not exhaustive—underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where appropriate to protect the public health.  *See Indep. Turtle Farmers of La. v. United States*, 703 F. Supp. 2d 604, 619–20 (W.D. La. 2010) (explaining that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361 [of the PHSA]"). Such measures include the authority to impose restrictions on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals." 42 U.S.C.§ 264(b)–(c). They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction." *Id*. at § 264(a).

In *Independent Turtle Farmers*, the court analyzed a regulation promulgated by the Food and Drug Administration ("FDA") that banned the sale of viable turtle eggs and live turtles with a shell of less than four inches in length ("Turtle Ban"). 703 F. Supp. 2d at 607. The Turtle Ban was the only federally enacted ban on the sale of any pet and was enacted primarily to curb the spread of salmonellosis. *Id*. The plaintiffs, an association of commercial turtle farmers, argued that the FDA did not have statutory and regulatory authority to enact and maintain the Turtle Ban. *Id*. at 618.

In analyzing whether Congress delegated power to the FDA to regulate the sale of turtles as pets, the court explained that the FDA derived its authority to enact the regulation from 42

U.S.C. § 264(a)—the same implementing statute involved in this case. *Id*. at 618-19. The court acknowledged that § 264(a) specifies that the FDA may provide for inspection, fumigation, disinfection, sanitation, pest extermination and destruction of animals or articles found to be so infected or contaminated. *Id*. at 619. Like Plaintiffs in this case, the *Independent Turtle Farmers* plaintiffs asked the court to "read this list of 'powers' as an exhaustive one." *Id*. That, the court was not willing to do.

First, the court explained that the list of enumerated items "directly precedes a 'catch-all' grant of authority, allowing the Secretary (or the FDA Commissioner) to enact '*other measures, as in his judgment may be necessary*,' in addition to the measures suggested in the list." *Id*. at 619-20 (emphasis added). The court explained that the catch-all phrase "precludes interpretation of the list as exhaustive." *Id*. at 620. The court further stated that "the list does not act as a limitation upon the types of regulations that may be enacted under [§ 264]. Instead, the list contains certain 'measures' which the FDA may employ [f]or purposes of carrying out and enforcing such regulations." *Id*. (citation omitted). Even though the enumerated list only speaks in terms of "destruction of animals"—and not regulating or preventing the sale of such animals—the court concluded that the Turtle Ban was permissible because "there is no express prohibition in the statute evidencing contrary congressional intent." *Id*. The court reasoned that the list of measures "is not phrased as a limitation upon the *type* of regulation that may be promulgated by the FDA. Instead, [§ 264(a)] grants the FDA authority to enact 'such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases.' " *Id*. (citation omitted). Ultimately, the court found that the FDA had the authority to enact a ban on the sale of turtles. *Id*.

In sum, the clear and broad delegation of authority in the first sentence of § 264(a); the context provided by the subsequent subSections; the parroting language of § 70.2, which specifically uses the term "including"—a term of enlargement; and, persuasive authority from the *Independent Turtle Farmers* decision, all point to the same conclusion: the Order has statutory and regulatory authority, and the CDC may take those measures that it deems reasonably necessary to prevent the spread of disease, so long as it determines that the measures taken by any state or local government are insufficient to prevent the spread of the disease.

The regulation does impose the additional requirement that the CDC "determine[] that the measures taken by the health authorities of state or local governments are insufficient to prevent the spread of disease." *Brown*, 2020 WL 6364310, at *8; see 42 C.F.R. § 70.2. The CDC has made that finding here. *See id*. at *13–14 (citing 85 Fed. Reg. at 55295–96 & n.36).

The terms of the statute—including the examples of measures that the Secretary may adopt—call for the Secretary's expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." *Id*. This point is bolstered by the fact that, although subSection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subSections (b) through (d). *See id*. § 264(a)–(d). The *Brown* court agreed: "The presence of the additional subSections governing detainment of individuals means that the list contained in the first subSection is not an exhaustive list of the permissible measures available to the Secretary of HHS." 2020 WL 6364310, at *8.

The regulation, which largely paraphrases the statutory language, is consistent with Congress's intent to provide flexibility in combatting the spread of disease. *See* 42 C.F.R. § 70.2.

It allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." *Id*. It further makes clear that, in order to control disease transmission, intrusions on private property, "including inspection, fumigation, disinfection, sanitation," and even "destruction," may be required. *Id*. The *Brown* court correctly observed that, because the statute and the regulation are so similar, "for the same reasons the Secretary of the HHS has broad authority to make and enforce regulations as in his judgment are necessary to prevent the spread of disease, the CDC likewise has the same authority." 2020 WL 6364310, at *8.

Here, the CDC's determination that a "temporary halt in evictions" is a "reasonably necessary measure under 42 C.F.R. § 70.2 to prevent the further spread of COVID–19 throughout the United States," 85 Fed. Reg. at 55296, is well supported and falls firmly within the scope of its authority. A number of findings underpin the CDC's decision. First, "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)." *Id*. at 55293. In addition, research suggests that, in the absence of eviction moratoria, tens of millions of Americans could be at risk of eviction, on a scale that would be "unprecedented in modern times." *Id*. at 55295. The CDC has also determined that, in light of statistics regarding interstate moves, such "mass evictions would likely increase the interstate spread of COVID-19." *Id*.

The CDC thus found that, in the context of this pandemic, eviction moratoria are an "effective public health measure utilized to prevent the spread of communicable disease." *Id*. at 55294. Eviction moratoria "facilitate self-isolation" by ill or at-risk persons; aid the implementation of "stay-at-home and social distancing directives"; and by reducing homelessness, decrease "the likelihood of individuals moving into close quarters in congregate

settings." *Id*. Evictions, on the other hand, increase the risk of COVID-19 spread by increasing

the likelihood that evicted renters will move into "shared housing or other congregate settings"

that pose a high risk of transmission, *id*., or experience unsheltered homelessness, where persons

are at a higher risk of infection due to lack of access to hygienic measures, sanitation, and

medical care, as well as exposure to the elements, *id*. at 55294–95. These are among the reasons

that the Order constitutes a "reasonably necessary" measure under the regulations and is thus

within the broad authority of the CDC.

Plaintiffs' additional argument that several of the canons of construction compel a

different result is not persuasive.   "For one thing, canons are not mandatory rules. They are

guides that 'need not be conclusive.'" *Chickasaw Nation v. United States*, 534 U.S. 84, 94

(2001) (citation omitted); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253,

(1992) (stating that "canons of construction are no more than rules of thumb that help courts

determine the meaning of legislation"). Canons are not necessarily outcome determinative

because "other circumstances evidencing congressional intent can overcome their force," and

"[s]pecific canons are often countered by some maxim pointing in a different

direction."  *Chickasaw Nation*, 534 U.S. at 94, (citation and internal punctuation omitted).

Furthermore, none of the canons apply here because there is no ambiguity to which they

could be applied.   The principle of *ejusdem generis* ". . . is only an instrumentality for

ascertaining the correct meaning of words *when there is uncertainty*,'" and "'it may not be used

to defeat the obvious purpose of legislation.'" *United States v. Powell*, 423 U.S. 87, 91 (1975)

(emphasis added) (citation omitted). Thus, where the court discerns no uncertainty in the statute

and congressional intent is clear, it is inappropriate to apply the rule. *Harrison v. PPG Indus.,*

*Inc*., 446 U.S. 578, 588-89 (1980).  The *noscitur a sociis* canon is not "an invariable rule

[because] [a] word may have a character of its own not to be submerged by its association." *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923). Importantly, it "ha[s] no place [in statutory construction], ... except in the domain of ambiguity," and it cannot be used to create doubt—only to remove it. *Id*.

Plaintiffs' invocation of the "federalism canon" rests upon the faulty premise that the Order alters the balance of power between the states and the federal government. This is not the case. The Order simply puts into play the settled constitutional principle that federal law preempts contrary state law. The Supremacy Clause states that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. CONST. ART. VI, cl. 2. The Supreme Court has explained that "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States," including by "legislat[ing] in areas traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Indeed, the federal government has a long history of regulating the rental housing market, including, most recently, in the form of a similar temporary eviction moratorium enacted as part of the CARES Act. *See* Pub. L. No. 116-136, § 4024, 134 Stat. 281 (Mar. 27, 2020). Moreover, the statute at issue here contains a clear statement that regulations enacted thereunder preempt state law "to the extent that such a provision conflicts with an exercise of Federal authority under this Section." 42 U.S.C. § 264(e). And contrary to Plaintiffs' assertions, the Order does not alter existing state law, but only pauses the ultimate execution of one remedy for breach of a rental agreement when certain other conditions are met.

Nor is the constitutional avoidance doctrine applicable. To start, "the canon of constitutional avoidance has no application in the absence of statutory ambiguity." *United States*

15

*v. Oakland Cannabis Buyers' Co-Op*., 532 U.S. 483, 494 (2001). It "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Plaintiffs fail to point to any ambiguity as to which the constitutional avoidance doctrine could prove the tiebreaker.

Further, none of the constitutional issues to which Plaintiffs point has any merit. First, Congress may delegate legislative power to the Executive so long as it provides an "intelligible principle" to guide the agency. *See e.g., Mistretta v. United States*, 488 U.S. 361, 372 (1989). The statute does so here. Second, it is well established that, under the Commerce Clause, the federal government may regulate activity that has a "substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005). And the Supreme Court has explicitly held that the commercial activity regulated here—"rental of real estate"—is "unquestionably" an activity that substantially affects interstate commerce. *Russell v. United States*, 471 U.S. 858, 862 (1985). Third, as explained, the Order does not create "a federal police power," but instead acts as a straightforward application of the Supremacy Clause. And fourth, as the *Brown* court found, "because [landlords] are still permitted to file breach of contract actions and begin eviction proceedings, and are only merely delayed in enforcing eviction orders," any claim that the Order violates a landlord's access to courts is unlikely to succeed. 2020 WL 6364310, at *14–17.

Finally, Plaintiffs argue that the CDC's interpretation of Sections 264(a) and 70.2 trigger lenity because that interpretation creates an ambiguity in the statute that the HHS or the CDC are then entitled to fill with whatever measures these agencies believe might prevent the spread of disease. The rule of lenity is a "venerable rule" designed to protect citizens from being "held accountable for a violation of a statute whose commands are uncertain or subjected to

punishment that is not clearly prescribed." *United States v. Santos*, 553 U.S. 507, 514 (2008). The rule therefore requires that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.

The Court finds that the rule of lenity is not implicated here. Even if Plaintiffs were right that the statute could theoretically be given a "narrower construction," or that the statute contained "some ambiguity," the rule of lenity is still not appropriate so long as the asserted ambiguity could be resolved using traditional tools of statutory interpretation. *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014). Plaintiffs have identified no "grievous ambiguity or uncertainty" as to what the statute authorizes, *see Muscarello v. United States*, 524 U.S. 125, 139 (1998), and the rule of lenity, therefore, does not apply.

For the above reasons, this Court finds that Plaintiffs have not clearly shown a substantial likelihood of success on the merits as to their claim that the Order was promulgated without statutory and regulatory authority. In other words, Plaintiffs have not clearly shown that the regulation limits the CDC's authority to measures involving inspection, fumigation, disinfection, sanitation, pest extermination, and the destruction of animals or articles believed to be sources of infection.

## 2.    The Non-Delegation Doctrine

Plaintiffs next argue that, if the Order is within the CDC's statutory and regulatory authority, Section 361(a) contains an unconstitutional delegation of authority. Article I of the United States Constitution vests "[a]ll legislative power" in Congress. U.S. CONST. ART. I, § 1. This assignment implies a "bar on [the legislative power's] further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Statutes that grant too much discretion to agencies tasked

with enforcing them effectively hand the task of lawmaking to the agency. Hence, statutes must contain "an intelligible principle to guide the delegee's use of discretion." *Id*.

Congress can authorize executive officers and agencies to determine facts and can delegate "the duty to carry out the declared legislative policy." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 426 (1935). Congress cannot, however, "[leave] the matter to the [executive] without standard or rule, to be dealt with as he please[s]." *Id*. at 418.

Plaintiffs argue that neither Section 264(a) nor Section 70.2 can be read broadly enough to allow the CDC to impose a nationwide eviction moratorium.  Plaintiffs assert that, if the CDC's interpretation is correct, then it has the ability to regulate, control, or outlaw any activity, which is to say that the CDC possesses the limitless discretion to make law concerning any of the wide range of activities that could conceivably lead to the transmission of disease in the United States. If the CDC is right, according to Plaintiffs, the roving power to control spread of disease is left entirely to the agency's "judgment." 42 U.S.C. § 264(a). The fathomless scope of the statute under the CDC's interpretation is exacerbated by the statute's failure to define "communicable disease." *See* 24 U.S.C. § 264.  Further, the statute does not limit the agency's authority to times of emergency, such as an outbreak or epidemic. Rather, the agency has authority to limit spread where no clear danger of a serious epidemic exists.  Additionally, according to Plaintiffs, the statute fails to limit the factual conditions under which the authority can be exercised, since transmission of communicable disease is an ever-present risk, and it offers no guidance on the nature of actions that can be taken when factual conditions are met, leaving that to the agency's judgment.

This Court finds that the statute meets the constitutional requirements for delegation to be valid. Congress may delegate legislative power so long as it provides an "intelligible principle"

to guide the agency. *See Mistretta*, 488 U.S. at 372; *see also, e.g., Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 441 (5th Cir. 2020). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73. Congressional delegations have been struck down as unconstitutional only twice in United States history—both in 1935— and only because "Congress had failed to articulate any policy or standard" to confine discretion. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion); *see also Big Time Vapes v. FDA*, 963 F.3d 436, 446 (5th Cir. 2020).

Instead, the Supreme Court has recognized on multiple occasions that the protection of public health and safety are intelligible principles sufficient to make a delegation constitutional. For example, the Court found an intelligible principle in a statute permitting the Environmental Protection Agency to set primary ambient air quality standards "requisite to protect the public health." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475–76 (2001). Similarly, a statute permitting the Attorney General to temporarily schedule a drug where he finds that doing so is "necessary to avoid an imminent hazard to the public safety" had an intelligible principle. *Touby v. United States*, 500 U.S. 160, 166 (1991); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (statute empowering the Secretary of Labor to determine what constituted a "safe" place of employment); *Big Time Vapes*, 963 F.3d at 444–45 (statement of statutory purpose to protect public health and prevent youth smoking). And the Court has, on multiple occasions, "approved delegations to various agencies to regulate in the 'public interest.'" *Gundy*, 139 S. Ct. at 2129 (plurality opinion) (*citing Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943), and *N.Y. Cent. Secs. Corp. v. United States*, 287 U.S. 12, 24 (1932)). In contrast, the only two acts ever struck down for violating nondelegation

principles either "provided literally no guidance for the exercise of discretion" or "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474; *see also Big Time Vapes*, 963 F.3d at 446.

The statute at issue here clearly passes muster under this precedent. The "general policy" articulated in subSection (a) is "to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). This disease-prevention authority is delegated to the Secretary of the HHS. *Id*. And the requirement that a regulation be "necessary" in the "judgment" of the HHS Secretary for the purpose of preventing the spread of disease provides meaningful, judicially reviewable boundaries on this grant of authority. *Id*.

Plaintiffs' contentions are not focused on the intelligible-principle standard, but rather rehash their argument regarding the alleged breadth of the authority granted to the HHS (and the CDC). But that is not the standard: "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby*, 500 U.S. at 165. To the contrary, "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. And the Supreme Court has noted that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474–75 (*quoting Mistretta*, 488 U.S at 416 (Scalia, J., dissenting)).

Here, Congress has permissibly chosen to delegate broad authority, within specified bounds, to public health experts regarding regulations in a fast-moving, complex, and technical area.

The Court finds that Plaintiffs have failed to establish an unconstitutional delegation of authority.

### 3.     The Administrative Procedures Act

Plaintiffs argue that the Order is void because the CDC failed to comply with the notice-and-comment requirements that apply to legislative rules under the APA. Defendants respond that the Order is not a rule to which those requirements apply—and even if it were, there was "good cause" to proceed without notice and comment given the urgent circumstances. See 5 U.S.C. § 553(b)(B).  Plaintiffs reply that the CDC's eviction moratorium unquestionably fits the definition of a legislative rule, as it is a statement of general applicability that carries the force of law and affects the rights of potentially millions of Americans.

The Court agrees with Defendants. The APA's notice-and-comment requirements apply to "rule making," *see* 5 U.S.C. § 553, with the term "rule" defined to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy," *id*. § 551(4)). But the Order here is not a rule; it is an "an emergency action taken under the existing authority of 42 CFR 70.2," 85 Fed. Reg. at 55296, a regulation that expressly authorizes the CDC to take "such measures to prevent such spread of the diseases as he/she deems reasonably necessary" to prevent further spread. 42 C.F.R. § 70.2. Given that the very purpose of these regulations is to enable the CDC to take swift steps to prevent contagion, the Court cannot conclude that the actions they authorize are also rules that require yet another round of notice and comment before they can take effect.

Even if the Order were a rule, notice-and-comment rulemaking is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable,

unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception excuses notice and comment in emergency situations, or where delay could result in serious harm. *See Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). The agency's finding here more than meets that standard: as the CDC explained, a "delay in the effective date of the Order . . . would defeat the purpose of the Order and endanger the public health. Immediate action is necessary." 85 Fed. Reg. at 55296. The CDC acted quickly given the "life-saving importance" of the Order, *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981), just as the APA permits. *See also, e.g., Vista Health Plan, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 18-824, 2020 WL 6380206, at \*9 (W.D. Tex. Sept. 21, 2020) (exception applies where delay would lead to a "significant threat of serious damage to important public interests.") (quoting *Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 802–03 (Temp. Emer. Ct. App. 1979))).

Plaintiffs nevertheless argue that Congress could not have intended to give the HHS or the CDC the sweeping authority they have claimed. Plaintiffs further submit that the existence of the CARES Act eviction moratorium, which Plaintiffs state Congress did "in the light of day through the normal lawmaking process," [Doc. No. 34, p. 17], serves as a rejoinder to the Defendants' claim that following notice-and-comment rulemaking would have been impracticable. Congress knew early in the pandemic that evictions were likely and managed to adopt a moratorium on March 27, 2020, that was set to expire in July. Plaintiffs state the CDC knew all this, yet it claims that it could only act on an "emergency" basis in late August, and that this is not a credible reason to ignore notice and comment. Plaintiffs further state that the expiration of the CARES Act moratorium can not constitute an "emergency," because that was a legislative choice, exclusively within Congress' power to make. *See* U.S. CONST. ART. I, § 1.

Plaintiffs are essentially arguing that the CDC could have started a rulemaking earlier, leaving time for a full notice-and-comment process. Yet the CDC could not propose an eviction moratorium without first determining that such a moratorium was necessary and that state and local measures were insufficient. *See* 42 C.F.R. § 70.2.  Congress and many states implemented similar eviction moratoria early in the pandemic; the expiration of these measures directly informed the CDC's determination as to the inadequacy of state measures and the necessity of the Order. *See* 85 Fed. Reg. at 55294 & n.14 (explaining that the CARES Act "helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic" but that the effects of its expiration were "expected to manifest" by August 27, 2020); *see also id.* at 55296 & n.36 (indicating that state and local eviction moratoria "have expired and are set to expire in many jurisdictions").

By the time the CDC made its determination, it had further determined that a delay would impede its critical public health goals.  Over a thousand Americans are now dying of COVID-19 every day, and delay would "do real harm." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979).

The Court finds that this case satisfies the good cause exception for emergency agency action. The Order explains, in detail, why a temporary eviction moratorium is reasonably necessary. The Order states that there is currently a global pandemic of COVID-19, which presents a "historic threat to public health." *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, 85 Fed. Reg. at 55,292. As of August 24, 2020, COVID-19 had infected over 5.5 million individuals in the United States, resulting in over 174,000 deaths. *Id*. Underscoring the seriousness of the pandemic, the CDC referenced one study that showed that the mortality rate associated with COVID-19 during the early phase of the outbreak

was comparable to the 1918 influenza pandemic, where 675,000 lives were lost in the United States alone. *Id*. In the Order, the CDC explains that despite measures such as border closures, travel restrictions and stay-at-home orders, COVID-19 continues to spread, and further action is needed. *Id*.

Plaintiffs have failed to show that the Order is invalid for failure to comply with the notice-and-comment requirements of the APA.

For the above reasons, the Court finds that Plaintiffs have not carried their burden of showing a likelihood that they will succeed on the merits.

### B.       Irreparable Injury

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013). To show irreparable harm, a party must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986) (emphases added).

Plaintiffs assert the Order causes them irreparable injury for three different reasons: (1) the Order violates the Constitution, (2) they cannot regain possession of their property, and (3) the tenants are likely to be insolvent when a judgment is rendered against them.  The Court will discuss each in turn.

### 1.       Violation of the Constitution

Plaintiffs argue that where constitutional claims are alleged, the Courts presume irreparable harm [Doc. No. 5-1, p. 27].  In other words, because the Order is unconstitutional,

they need not show any additional harm to satisfy the irreparable injury requirement. They argue the Order violates the separation of powers because it amounts to the CDC making law.  They also argue the Order effectively closes the courthouse door on Plaintiffs, thus preventing them from redressing the violation of their property and contract rights.

This Court disagrees with Plaintiffs' position that irreparable harm is automatically presumed where constitutional claims are alleged. As courts in this Circuit have explained, "[t]hat the nature of certain constitutional violations, such as violations of the freedoms of speech and privacy, is such that they necessarily cause irreparable harm does not, however, establish that any alleged constitutional violation does so." *Lambert v. Bd. of Comm'rs of Orleans Levee Dist.*, No. CV 05-5931, 2006 WL 8456316, at *7 (E.D. La. Mar. 22, 2006); *see also, e.g., Bouchard Transp. Co. v. Dep't of Homeland Sec.*, No. 20-1116, 2020 WL 1689869, at *2 (E.D. La. Apr. 7, 2020) (similar). Additionally, as another federal court recently explained in denying a preliminary injunction in a similar challenges to the CDC Order, "[m]erely asserting a constitutional claim is insufficient to trigger a finding of irreparable harm," particularly where the alleged injury "involves neither free speech nor invasion of privacy." *Brown*, 2020 WL 6364310, at *18.

Further, this is primarily a statutory case, not a constitutional one, as the overwhelming bulk of Plaintiffs' motion contends that the Order (1) exceeds CDC's statutory and regulatory authority, or (2) violates the APA.  Because these claims are unlikely to succeed for the reasons set forth above, they cannot support a finding of irreparable harm.

### 2.    Inability to Regain Possession of their Property

Plaintiffs contend they face irreparable injury because they cannot regain possession of their property. They argue that loss of a property interest has often been proof of irreparable

harm. *See, e.g., Ridgley v. Federal Emergency Management Agency*, 512 F.3d 727, 735 (finding

that plaintiffs did not have a property interest in that case, but accepting the premise that if such

an interest existed it would justify finding irreparable harm); *see also Girl Scouts of Manitou*

*Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (holding

that "[a]s a general rule, interference with the enjoyment or possession of land is considered

'irreparable' since land is viewed as a unique commodity"); *Minard Run Oil Co. v. U.S. Forest*

*Service*, 670 F.3d 236, 256 (3d Cir. 2011) ("[W]here 'interests involving real property are at

stake, preliminary injunctive relief can be particularly appropriate because of the unique nature

of the property interest.'") (quoting *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1210 (10th Cir.

2009)); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (holding that

where loss of real property was at issue, irreparable harm existed); *K-Mart Corp. v. Oriental*

*Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989) (finding that damage to real estate, because of its

inherent uniqueness, constituted irreparable harm).

Plaintiffs also contend the Order affects their property rights by abrogating their right to

exclude, a fundamental aspect of property rights. *See Kaiser Aetna v. United States*, 444 U.S.

164, 179–80 (1979) (recognizing the right to exclude as "universally held to be a fundamental

element of the property right"). Accordingly, Plaintiffs submit disallowing possession of one's

property constitutes irreparable injury.

Like the Court in *Brown*, *supra*, this Court concludes that none of the cases cited by

Plaintiffs compel a categorical finding that Plaintiffs have suffered an irreparable harm.

Plaintiffs' cases are inapposite because all involve permanent deprivation or destruction of

property. *Brown*, 2020 WL 6364310, at *21. Just as in *Brown*, there is "no evidence before the

Court" that Plaintiffs "are in danger of losing those properties." *Id*. Instead, the Order merely

26

limits, on a temporary basis, landlords' ability to invoke one remedy for non-payment of rent. It does not preclude evictions for other reasons, nor does it affect Plaintiffs' title to their property.

Further, Plaintiffs do not allege, nor is there any evidence before the Court, that any of the Plaintiffs actually reside in their properties or that they seek to reside in a property but have been prevented from doing so because it is occupied by a tenant who is a "covered person" under the Order.  Where property is used as an "investment property," the plaintiff can "recoup its investment loss through money damages." *Mount Clemens Inv. Grp., LLC v. Borman's Inc.,* No. 10-12679, 2010 WL 3998095, at *5 (E.D. Mich. Oct. 12, 2010).

This claim does not establish the presence of irreparable injury.

### 3.    Tenants Will be Insolvent

Plaintiffs argue that, if the sworn statements in the Renter Declarations are taken seriously, then the tenants are necessarily insolvent because they have attested to the fact that they cannot meet their contractual obligations.  Also, while the Order theoretically permits landlords to pursue back rent and late fees, the reality is that landlords cannot collect from insolvent tenants. Further, there is no basis for assuming an insolvent individual will see a dramatic change in fortunes. And if there is no meaningful prospect of collecting from nonpaying tenants then there is necessarily irreparable harm.

The Court finds that Plaintiffs cannot satisfy their burden by suggesting that it may be difficult to enforce money judgments against their tenants. Nothing in the Order prevents Plaintiffs from suing their tenants for unpaid rent. *See Elmsford Apt. Assocs., LLC v. Cuomo,* No. 20-4062, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020). And "as a general rule," "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro*, S.A., 875 F.2d 1174,

1179 (5th Cir. 1989). Even economic injuries that are "substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs contend that this doctrine does not apply because it may be difficult to collect money judgments for unpaid rent entered against their tenants.  However, the certainty of monetary relief is not required; even "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2020)

Further, Plaintiffs offer only speculation that no monetary judgment could be enforced against their tenants. Notably, the form declaration does not require tenants to allege that they are insolvent; they need only allege that they are currently unable to satisfy their rent obligations in full. *See 85 Fed. Reg. at 55297*. As in *Brown*, Plaintiffs have provided no information about "the occupation of any of the tenants, whether they are employed or unemployed (and, if unemployed, their prospect for reemployment), whether they are (or have been) sick, whether they have money in the bank, whether they qualify for some type of government assistance, whether they could obtain a loan to cover their rent or the nature of their credit histories." 2020 WL 6364310, at *20. Nor do they indicate whether their tenants have any illiquid assets against which they might seek to enforce a money judgment. As in *Brown*, "although the tenants may not currently be able to afford their rent," it does not follow that "they will likely never be able to collect a judgment." *Id*. at *20. Indeed, tenants may become eligible for various government benefits, id., or they may find employment in the future. Plaintiffs, however, offer no evidence to show that there is no "possibility that adequate compensatory or other corrective relief will be

available at a later date," *Dennis Melancon, Inc.,* 703 F.3d at 279—and that "lack of evidence

precludes a finding of irreparable harm," *Brown*, 2020 WL 6364310, at *20.

      Moreover, the Order does not bar Plaintiffs from evicting their tenants forever; it merely

postpones that remedy for a limited time in furtherance of urgent public health goals. *See Brown,*

2020 WL 6364310, at *16 ("[T]he Order is temporary; therefore, Plaintiffs' ability to evict their

tenants is only merely delayed until it expires on December 31, 2020, unless extended, modified

or rescinded.").

      This Court is keenly aware that Plaintiffs are currently being harmed, because they are

being forced by the Order to continue to provide housing for non-paying tenants.  In addition to

being unable to collect rent, Plaintiffs are having to pay their own mortgages on the property, are

incurring maintenance costs, and are enduring damage to their property from wear and tear.

They are also being deprived of the rent that new replacement tenants would be paying.

      However, Plaintiffs have not carried their burden of showing their losses are non-

compensable and therefore irreparable.

### C.     The Threatened Injury and the Harm the Preliminary Injunction Would Cause to the Non-Movant and the Public Interest

      The Court will analyze the final two factors together: harm to the opposing party, and the

public interest.  Plaintiffs assert that it can never be in the public interest to take actions that have

not been authorized by Congress because *ultra vires* regulation violates the will of the governed.

*See INS v. Chadha*, 462 U.S. 919, 951–52 (1983) (defining the Legislature's constitutional

authority). Plaintiffs further assert that it can never be in the public interest to allow continued

enforcement of a rule that violates the Administrative Procedure Act because, with enactment of

the APA, Congress decided that adherence to notice-and-comment procedures served vital public

functions. Finally, Plaintiffs argue that it can never be in the public interest for government to

29

violate separation of powers because the Constitution represents the "ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

Defendants respond that the balance of the harms overwhelmingly favors the government, and the injunction Plaintiffs seek is contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (observing that "[t]hese factors merge when the Government is the opposing party"). The CDC issued the Order to prevent the spread of an easily transmissible, potentially serious, and sometimes fatal disease that has infected more than fourteen million and killed more than 280,000 persons within the United States. *See* 85 Fed. Reg. at 55292; *see also* CDC COVID Data Tracker. As the *Brown* Court held,

> In evaluating whether the threatened injury of various state-mandated COVID-19 restrictions would outweigh the damage to the public's interest if they were overturned, federal courts across the country have routinely concluded that undoing orders deemed necessary by public health officials and experts to contain a contagious and fast-spreading disease would result in comparatively more severe injury to the community.

2020 WL 6364310, at *22.

In balancing the equities and considering the public interest, courts properly decline to second-guess the judgments of public health officials. *See, e.g., TJM 64*, 2020 WL 4352756, at *8 (refusing to enjoin local COVID-19 ordinance because such an injunction would "present a risk of serious public harm and foster the continued spread [of the] COVID-19 virus"); *Auracle Homes*, 2020 WL 4558682, at *21 ("given the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction"); *Tigges v. Northam*, No.

20-410, 2020 WL 4197610, at *10 (E.D. Va. July 21, 2020) ("The public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by enjoining state officials from taking executive action designed to slow the spread of COVID-19."); *Talleywhacker, Inc. v. Cooper,* 465 F. Supp. 3d 523, 543 (E.D.N.C. June 8, 2020) (finding that "the public interest does not weigh in favor of injunctive relief" where the government takes "intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic," and "neither the court nor plaintiffs are better positioned to second-guess those determinations").

As the *Brown* court found in weighing arguments similar to those Plaintiffs advance here, any "economic harm pales in comparison to the significant loss of lives that Defendants have demonstrated could occur should the Court block the Order." 2020 WL 6364310, at *23. And although that court found that plaintiffs there were unlikely to succeed on their constitutional claims, it observed that "[e]ven if Plaintiffs did show a constitutional violation, the showing would not be enough to outweigh the public interest." *Id*.

This Court agrees.

Therefore, for the above reasons, the Court finds that the balance of the harms and the public interest thus tilt decisively in favor of the government.

## III.    CONCLUSION

As the Court indicated above, it is clear that the Order requiring Plaintiffs to provide housing for tenants who are not paying their rent has harmed Plaintiffs.  But it is also clear that this pandemic has adversely affected millions of Americans, as well as much of the nation's economy. Plaintiffs have failed to satisfy the standards necessary for obtaining a preliminary injunction as a matter of law. After thoroughly reviewing the record and the evidence cited

therein, this Court finds that Plaintiffs have not clearly established their burden of persuasion as to any of the four prerequisites. Accordingly, Plaintiffs' Motion for Preliminary Injunction [Doc. 5] is **DENIED**.

Monroe, Louisiana, this 22nd day of December, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**