**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| CHAMBLESS ENTERPRISES LLC; and APARTMENT ASSOCIATION OF LOUISIANA, INC., | Case No. 3:20-cv-01455-TAD-KLH |
| Plaintiffs, | |
| v. | JUDGE TERRY A. DOUGHTY |
| CENTERS FOR DISEASE CONTROL AND PREVENTION; ROBERT R. REDFIELD, in his official capacity as Director, Centers for Disease Control and Prevention; NINA B. WITKOFSKY, in her official capacity as Acting Chief of Staff, Centers for Disease Control and Prevention; ALEX AZAR, in his official capacity as Secretary of Health and Human Services; DEPARTMENT OF HEALTH AND HUMAN SERVICES; WILLIAM P. BARR, in his official capacity as Attorney General of the United States, | MAGISTRATE JUDGE KAYLA D. McCLUSKY |
| Defendants. | |

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiffs submit this Notice of Supplemental Authority to inform the Court of the decision by the United States District Court for the Northern District of Ohio in *Skyworks Ltd. v. Centers for Disease Control and Prevention*, No. 5:20-cv-02407-JPC (Mar. 10, 2021), attached hereto as Exhibit 1. The Northern District of Ohio's decision concludes that the Centers for Disease Control and Prevention (CDC) lacks statutory authority to impose a nationwide eviction moratorium.

"The most natural and logical reading of the statute as a whole does not extend the CDC's power as far as Defendants maintain. Such a broad reading of the statute, and the term 'other measures' in particular, would authorize action with few, if any, limits—tantamount to creating a

general police power. It would also implicate serious constitutional concerns . . . . But the text does not authorize such boundless action or depend on the judgment of the Director of the CDC or other experts for its limits. The eviction moratorium in the CDC's orders exceeds the statutory authority Congress gave the agency." *Id*. at 23.

The Northern District of Ohio joins now with the Eastern District of Texas in setting aside and vacating CDC's Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020). *See Terkel v. Centers for Disease Control and Prevention*, No. 6:20-cv-00564 (Feb. 25, 2021).

DATED: March 11, 2021.

Respectfully submitted,

/s/ STEVEN M. SIMPSON
STEVEN M. SIMPSON*
DC Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org

/s/ JAMES C. RATHER, JR.
JAMES C. RATHER, JR.
Louisiana Bar No. 25839
ALKER & RATHER, LLC
4030 Lonesome Rd., Suite B
Mandeville, LA 70448
Tel: (985) 727-7501
JRather@alker-rather.com

LUKE A. WAKE*
DC Bar No. 1009181
ETHAN W. BLEVINS*
Washington State Bar No. 48219
HANNAH SELLS MARCLEY*
Washington State Bar No. 52692
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Tel: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org
EBlevins@pacifclegal.org
HMarcley@pacificlegal.org
*Pro hac vice*

*Attorneys for Plaintiffs*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2021, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon counsel of record.

By */s/* STEVEN M. SIMPSON
           STEVEN M. SIMPSON

**Exhibit 1 to Plaintiffs'
Notice of Supplemental
Authority**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SKYWORKS, LTD., *et al.*, | ) | Case No. 5:20-cv-2407 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Carmen E. Henderson |
| CENTERS FOR DISEASE | ) | |
| CONTROL AND PREVENTION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

In the early days of the coronavirus pandemic, Congress swiftly enacted a nationwide moratorium on evictions. That congressional action expired on July 24, 2020. About two weeks later, President Trump directed his administration to consider whether such a measure should be part of efforts to combat the spread of Covid-19 moving forward. In response, the Centers for Disease Control and Prevention, commonly known as the CDC, ordered a moratorium on some, but not all, evictions. That moratorium differs somewhat from the one Congress enacted and is set to expire on March 31, 2021.

Plaintiffs, a collection of landlords, property managers, and a trade association representing similar persons, bring various challenges to the authority of the CDC to issue the moratorium and seek to enjoin its enforcement. Plaintiffs' challenges and CDC's response implicate any number of competing public interests—from public health and welfare during a pandemic to disruption of property rights and the

efficient operation of the nation's housing and rental markets, from providing economic relief to tenants struggling as so many are with the economic fallout resulting from the policy responses to the pandemic to the proper role of the national and State governments in our federal system. None of these interests compel a particular result in this case. That is, one may view the CDC's eviction moratorium as good and essential public policy or the opposite. But those considerations are not for the Court. Nor may the Court decide this case based on its own personal or policy preferences or its views of the competing public interests involved.

Instead, this dispute presents a narrower question. This case turns on whether Congress has authorized the CDC to adopt a nationwide eviction moratorium. That narrower issue depends on interpretation of the particular statutes at issue—a more lawyerly and arcane task about which reasonable people may ultimately disagree. It also requires more careful and thoughtful analysis than what typically drives headlines and broad public comment, particularly on social media, in cases of this sort.

## STATEMENT OF FACTS

As Americans have come to know over the past year, the novel SARS-CoV-2 virus, first detected in China, has the potential to cause a severe respiratory disease known as Covid-19, which manifests with a variety of symptoms, including cough, fatigue, muscle or body aches, loss of taste or smell, and difficulty breathing, among others. *See generally* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation 9994, 85 Fed. Reg. 15,337, 15,337 (Mar. 13, 2020); Temporary Halt in Residential Evictions to Prevent the

Further Spread of COVID-19, 85 Fed. Reg. 55,292, 55,292 (Sept. 4, 2020). Persons infected with Covid-19 may require hospitalization, intensive care, or the use of a ventilator. 85 Fed. Reg. at 55,292. Though the medical community continues to develop new treatments and therapies, severe cases of Covid-19 may prove fatal. *Id.* Certain populations, including those with co-morbidities such as obesity, serious heart conditions, or diabetes have an increased risk for severe illness if infected. *Id.*

The virus spreads easily by airborne transmission. *Id.* Prolonged, close contact (within approximately six feet) creates conditions for easy transmission through droplets produced when a carrier talks, coughs, or sneezes. *Id.* Those who do not manifest symptoms but are infected can spread the disease. *Id.*

## A.    The CARES Act Statutory Moratorium

On March 13, 2020, President Trump declared Covid-19 a national emergency. 85 Fed. Reg. at 15337–38. Since then, the nation has undertaken extensive and unprecedented steps to manage the spread of the disease and address the economic fallout. Of relevance here, Congress passed and President Trump signed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-134 (Mar. 27, 2020) (the "CARES Act"). Sections 4022 through 4024 of the CARES Act addressed housing-related issues, including protections for holders of federally backed mortgages. *See id.* § 4024(b).

Among other things, the CARES Act enacted a 120-day moratorium on eviction filings based on the failure of a tenant residing in certain federally financed properties to pay rent. The statute provides:

3

> During the 120-day period beginning on the date of enactment of this Act, the lessor of a covered dwelling may not—
>
> (1) make, or cause to be made, any filing with the court of jurisdiction to initiate a legal action to recover possession of the covered dwelling from the tenant for nonpayment of rent or other fees or charges; or
>
> (2) charge fees, penalties, or other charges to the tenant related to such nonpayment of rent.

*Id.* Additionally, the statute prevented a landlord from giving a notice of eviction to a tenant residing in a covered property until the 120-day statutory eviction moratorium expired and, even then, forestalled eviction proceedings for an additional 30 days. *Id.* § 4024(c). This moratorium and other protections for renters expired on July 24, 2020.

During this general timeframe, various States implemented eviction moratoria of their own. *See* 85 Fed. Reg. at 55,296 n.36. Some have since expired. *Id.*

## B.    The First CDC Order

On August 8, 2020, President Trump issued an executive order directing the Secretary of Health and Human Services and the Director of the CDC to "consider whether any measures temporarily halting residential evictions for any tenants for failure to pay rent are reasonably necessary to prevent the further spread of COVID-19 from one State or possession into any other State or possession." Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners, Executive Order 13,945, 85 Fed. Reg. 49,935, 49,936 (Aug. 8, 2020).

Pursuant to Executive Order 13,945, the CDC so found, and issued its first eviction moratorium on September 4, 2020. *See* Temporary Halt in Residential

4

Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020). Acting on an emergency basis pursuant to Section 361 of the Public Health Service Act, 42 U.S.C. § 264, and 42 C.F.R. § 70.2, and affirmatively disclaiming promulgation of a rule under the Administrative Procedure Act, the CDC "determined the temporary halt in evictions in this Order constitutes a reasonably necessary measure . . . to prevent the further spread of COVID-19 throughout the United States." 85 Fed. Reg. at 55,296. Indeed, the CDC acted based on "the convergence of COVID-19, seasonal influenza, and the increased risk of individuals sheltering in close quarters in congregate settings such as homeless shelters, which may be unable to provide adequate social distancing as populations increase" as fall and winter approached. *Id.* But the CDC also sought to head off further spread of Covid-19 when individuals become homeless and unsheltered. *Id.*

### B.1. Key Provisions of the First CDC Order

The first CDC order imposed a moratorium on evictions through December 31, 2020, by directing that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person." *Id.* Unlike the statutory moratorium enacted in the CARES Act, which applied to certain federally backed rental properties, the first CDC order applied throughout the nation to all residential properties. *Id.* at 55,293.

The CDC moratorium does *not* provide relief for tenants' rent obligations. *Id.* at 55,292. That is, notwithstanding the moratorium, a tenant is still responsible for rent and other housing payments provided by lease, which continue to accrue, plus fees, penalties, and interest. *Id.* 55,296. Nor does the CDC moratorium preclude

eviction of tenants who, for example, engage in criminal activity on the premises, violate building codes, damage property, threaten the health and safety of others, or breach their lease in some way other than untimely payment of rent. *Id.* at 55,294.

Moreover, the moratorium is not self-executing. To receive protection under the first CDC order, tenants must submit to their landlords a declaration affirming that they satisfy seven criteria: (1) they have used best efforts to obtain government assistance to make rental payments; (2) they expect to earn less than $99,000 in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) they are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) they are using best efforts to make partial payments; (5) they would likely experience homelessness or need to move into a shared residence if evicted; (6) they understand that rent obligations still apply; and (7) they understand the moratorium ends on December 31, 2020. *Id.* at 55,297.

### B.1.a. Rental Assistance

The CDC's first order notes that the Department of Housing and Urban Development informed CDC that recipients of certain federal funds under the CARES Act—States, cities, communities, and nonprofits—may use those funds to provide rental assistance and otherwise prevent evictions. *Id.* Likewise, the first order notes that the Treasury Department allows use of certain federal funds for rental assistance to prevent evictions. *Id.*

6

### B.1.b. Enforcement

For its enforcement, the first CDC order contemplates federal cooperation with State and local officials and authorizes the Department of Justice to initiate proceedings to enforce the order. *Id.* at 55,296. It also provides for criminal penalties. A violation subjects individuals to a fine up to $250,000, one year in jail, or both. *Id.* Corporate landlords who violate the order can be fined up to $500,000. *Id.* Finally, the CDC found that "measures by states, localities, or U.S. territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19." *Id.* But the first CDC order did not identify which States, localities, or territories meet or exceed its protections for renters.

### B.2. Guidance

In guidance issued in October 2020, the CDC stated that its first order "does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court." *See* HHS/CDC Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19: Frequently Asked Questions at 4 (Oct. 12, 2020) (available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf). Further, the guidance clarifies landlords may commence eviction proceedings so long as the eviction of a covered person for nonpayment of rent does not take place during the moratorium. *Id.* In this respect, CDC confirmed that its first order does not "terminate or suspend the operations of any state or local court." *Id.* at 1.

### C.  Temporary Congressional Extension

Following the 2020 presidential election and as the December 31, 2020 expiration date for the first CDC order drew near, Congress passed the Consolidated Appropriations Act of 2021, which President Trump signed into law on December 27, 2020.  That continuing resolution to fund the federal government for the balance of the fiscal year extended the CDC eviction moratorium through January 31, 2021.  As relevant here, the Consolidated Appropriations Act provides:

> The order issued by the Centers for Disease Control and Prevention under section 361 of the Public Health Service Act (42 U.S.C. 264), entitled "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19" (85 Fed. Reg. 55292 (September 4, 2020) is extended through January 31, 2021, notwithstanding the effective dates specified in such Order.

Pub. L. No. 116-260, div. N, tit. V, § 502, 134 Stat. 1182, 2079 (2020).  In the legislation, Congress did not otherwise address the eviction moratorium in the first CDC order, amend the Public Health Service Act, or enact a separate statutory moratorium as it did in the CARES Act.

The Consolidated Appropriations Act also appropriates $25 billion in emergency rental assistance to State and local governments to provide financial assistance to eligible households, "including the payment of rent [and] rental arrears," *id.* § 501(c)(2), either directly to renters or to landlords, *id.* § 501(f).

### D.  The Second CDC Order

On January 29, 2021, the CDC issued its second order, extending its first order from September 2020 through March 31, 2021.  Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8020 (Feb. 3,

2021). In its second order, CDC incorporated much of its first order, but updated its findings. *Id.* at 8021. In particular, CDC referenced studies that "[p]reliminary modeling projections and observational data" from States that lifted eviction moratoria "indicate that evictions substantially contribute to COVID-19 transmission." *Id.* at 8022. Further, CDC postulated, based on "statistics on interstate moves," that "mass evictions would likely increase the interstate spread of COVID-19." *Id.* at 8023.

As additional grounds for its second order, CDC pointed to worsening conditions since September 4, 2020, *id.*at 8025, and emerging variants of the virus, *id.* at 8021. Also, CDC documented outbreaks of Covid-19 at homeless shelters, *id.* at 8023, and made recommendations for shelters and other facilities housing those evicted to minimize the risk of transmission of SARS-CoV-2, *id.* at 8022, 8023. Finally, the CDC's second order observed that eviction filings continued during the moratorium such that allowing it to expire would result in large numbers of evictions and contribute to the spread of Covid-19. *Id.* at 8024, 8025.

### E. The American Rescue Plan Act of 2021

On March 10, 2021, Congress enacted the American Rescue Plan Act, H.R. 1319, an approximately $1.9 trillion piece of legislation publicly touted as providing economic relief in the wake of Covid-19 and taking other measures to curb its spread. Beyond providing additional financial assistance to help prevent evictions, no provision of that legislation addresses the CDC's moratorium.

9

## STATUTORY AND REGULATORY BACKGROUND

Section 361 of the Public Health Service Act, enacted in 1944, permits the Secretary of the Department of Health and Human Services to authorize the CDC to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" from foreign countries into the United States or between States. 42 U.S.C. § 264(a). (Although the statute states that this authority belongs to the Surgeon General, subsequent reorganizations not relevant here have resulted in the transfer of this responsibility to the Secretary.) Section 361 goes on to direct the Secretary to make and enforce regulations for specific actions:

> For purposes of carrying out and enforcing such regulations, the [Secretary] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, *and other measures, as in his judgment may be necessary.*

42 U.S.C. § 264(a) (emphasis added). Although other provisions of the statute do not bear directly on the dispute, they impose limits on the Secretary's power to apprehend, detain, or release individuals, *id.* § 264(b) & (c); authorize the Secretary to issue regulations to apprehend and examine people crossing State lines believed to be infected, *id.* § 264(d); and preempt State laws that conflict with federal authority in this area, *id.* § 264(e).

In promulgating regulations pursuant to the delegation in Section 361(a), 42 U.S.C. § 264(a), the Secretary in turn charged the CDC with taking measures to

prevent the spread of disease in language tracking that of the statute. The applicable regulation provides:

> Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession, he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.

42 C.F.R. § 70.2. Under the regulation, a determination that State actions are insufficient to prevent the spread of a disease is a precondition to action by the CDC. As with the statute, the regulation requires the spread of a communicable disease across State lines before CDC may act. Finally, the regulation requires "reasonably necessary" agency actions but omits the last words of the statute, which authorizes "other measures" beyond the specific list of permissible actions introduced with the word "including." *Compare* 42 U.S.C. § 264(a) *with* 42 C.F.R. § 70.2. This regulation provides for criminal penalties that track those set forth in the orders at issue. 42 C.F.R. § 70.18.

## STATEMENT OF THE CASE

### A.      Parties and Claims

The National Association of Home Builders is a Nevada non-profit corporation that represents "companies that own and manage multi-family housing units." (ECF No. 1, ¶ 16, PageID #4.)  Apart from the National Association of Home Builders, Plaintiffs are property owners or managers of rental properties located in this District.    (*Id.*,  ¶¶ 12–15,  PageID #3–4.)    Plaintiff Monarch Investment and

Management Group manages two companies, Plaintiffs Cedarwood Village Apartments I & II Owner B, LLC and Toledo Properties Owner B, LLC. (ECF No. 12-2, PageID #119.) Plaintiff Skyworks, Ltd. manages Clear Sky Realty, Inc. (*Id.* at PageID #138.) Each of the three direct property managers—Cedarwood Village, Toledo Properties, and Clear Sky—had tenants who claimed protection under the first order. (*Id.* at PageID #119–20, 131–32 & 138–39.) Two of those tenants—those living at Toledo Properties' and Clear Sky's properties—have since moved out or abandoned their rental units. (ECF No. 41-1, PageID #512–13; ECF No. 44-1, PageID #559–60.) There are currently three tenants at Cedarwood's property who have invoked the protections of either CDC order. (ECF No. 52, PageID #1850.)

In addition to the parties, various amici appeared supporting Plaintiffs. They include the New Civil Liberties Alliance, the National Apartment Association, and the National Association of Residential Property Managers. (ECF No. 20, PageID #184.)

In the complaint, Plaintiffs claim: (1) the CDC's orders exceed the agency's statutory and regulatory authority in violation of the Administrative Procedure Act (Count I); (2) the orders are an unconstitutional exercise of legislative power in violation of Article I, Section 1 of the Constitution (Count II); (3) the CDC failed to engage in required notice and comment rulemaking in violation of the APA (Count III), (4) and that the Order is arbitrary and capricious in violation of the APA (Count IV). (*Id.*, ¶¶ 58–101, PageID #12–19.) Plaintiffs seek a declaratory judgment,

injunctive relief, and attorneys' fees and costs. (*Id.*, PageID #19.) Plaintiffs moved for a preliminary injunction. (ECF No. 12.)

Plaintiffs named as Defendants the Centers for Disease Control and Prevention and various officials from the Trump Administration with responsibility for enforcing the CDC's first order. (ECF No. 1, PageID #1.) Under Rule 25(d), officials in the Biden Administration substitute for those officials. (*See* ECF No. 45, PageID #561 n.1.) At this point, Defendants are the CDC; its Director, Rochelle P. Walensky and its acting Chief of Staff, Sherri P. Berger; the Department of Health and Human Services and its acting Secretary Norris Cochran; and Monty Wilkinson, the acting United States Attorney General.

Various amici support the CDC's eviction moratoria. They include several organizations: Community Legal Aid Services, Inc. and the National Housing Law Project (ECF No. 31, PageID #360), as well as the American Academy of Pediatrics, American Medical Association, Children's Healthwatch, Coalition on Homelessness and Housing in Ohio, the George Consortium, GLMA: Health Professionals Advancing LGBTQ Equality, National Medical Association, Ohio Chapter of the American Academy of Pediatrics, and Public Health Law Watch (ECF No. 38, PageID #479). The amici also include multiple individuals: Emily A. Benfer, Matthew Desmond, Gregg Gonsalves, Peter Hepburn, Danya A. Keene, Kathryn M. Leifheit, Michael Z. Levy, Sabriya A. Linton, Craig E. Pollack, Julia Raifman, Gabriel L. Schwartz, and David Vlahov. (*Id.*)

## B. Procedural Posture

Following the completion of briefing on Plaintiffs' motion for a preliminary injunction, the case was reassigned to the undersigned. (*See* Order, Dec. 16, 2020.) Because the Consolidated Appropriations Act of 2021 was pending at the time, the parties agreed to defer action on the motion for a preliminary injunction. (ECF No. 40, PageID #507.) After the CDC issued its second order, the parties submitted supplemental briefing. Defendants filed their supplement on February 12, 2021. (ECF No. 47.) Plaintiffs did the same on February 22, 2021. (ECF No. 48.)

At a subsequent status conference, the Court proposed, and the parties agreed, to advance determination of the merits pursuant to Rule 65(a)(2). (Minute Order, Feb. 26, 2021.) During that status conference, the parties also agreed that there are no material disputes of fact requiring presentation of evidence, so the Court converted the preliminary injunction hearing to oral argument on Plaintiffs' challenge to the CDC's eviction moratorium (*id.*), which the Court held on March 5, 2021. In addition to the parties' submissions, the Court analyzed the briefs of the amici for Plaintiffs and Defendants and the administrative record (ECF No. 49) as part of its ruling.

## JURISDICTION

Although no party directly raises the issue, the Court has an independent obligation to examine its own jurisdiction. *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017) (citations and quotations omitted); *Mercurio v. American Express Centurion Bank*, 363 F. Supp. 2d 936, 938 (N.D. Ohio 2005). Federal courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or

treaties of the United States." 28 U.S.C. § 1331. Therefore, the Court has jurisdiction over this dispute.

Nonetheless, standing presents a "threshold determinant[] of the propriety of judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975). "[A]t an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" and that "the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986) (cleaned up); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

To establish injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560. A particularized injury "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). An injury must also be concrete, which means it must actually exist. *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)). A concrete injury is real and not abstract, but not necessarily tangible. *Id.* (citations omitted).

Applying these principles to the claims here, upon examination of the record, the Court determines that Plaintiffs have standing. The landlord-Plaintiffs, Monarch (which manages Cedarwood and Toledo Properties) and Skyworks (which manages Clear Sky), were, are currently being, or will likely and imminently be harmed in an

Article III sense by the current order's requirement that they provide housing for non-paying tenants. All the landlord-Plaintiffs represented that, at one point at least, they had tenants who asserted they were covered persons under the order and did not pay their rent. (ECF No. 12-2, PageID #119–20, 131–32, 138–39.) The Clear Sky tenant moved out without settling rent arrears. (ECF No. 41-1, PageID #512.) Toledo Properties had a nonpaying tenant voluntarily vacate its property, but Monarch anticipates more tenants will imminently seek the protections of the order, although none yet have. (ECF No. 44-1, PageID #560.) The other landlord, Cedarwood (also managed by Monarch), has a tenant in possession who is a covered person and not currently paying rent. (ECF No. 12-2, PageID #119–20.)

As for the National Association of Homebuilders, it does not attempt to assert organizational standing, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), but it does have representational standing because "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181 (2000)); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). That is, the National Association of Homebuilders has standing to sue if one of its members can demonstrate: "(1) an injury in fact; (2) a causal connection between the alleged injury and the defendants' conduct . . . ; and (3) redressability—that the

injury will likely be redressed by a favorable decision." *Club v. United States E.P.A.*, 793 F.3d 656, 661–62 (6th Cir. 2015) (cleaned up).

In a footnote, Defendants question whether the National Association of Homebuilders has standing (ECF No. 23, n.9, PageID #259), to which the Plaintiffs replied and also submitted a supplemental declaration. (ECF No. 33, PageID #401 n.1.) That supplemental declaration comes from an Indiana landlord, a member of the organization, who had tenants fail to pay rent and seek protection under the order. (ECF No. 33-1, PageID #423–26.) In addition to this supplemental declaration, the evidence before the Court shows that landlords in Ohio who are members of the National Association of Homebuilders have received declarations from tenants seeking protection under the CDC's orders. (ECF No. 12-2, PageID #148–49.) Those tenants have stopped paying rent and would be subject to eviction in the absence of the order. (*Id.*) For these reasons, the Court concludes, like other courts that have considered similar suits, that Plaintiffs have standing. *See Tiger Lily v. United States Dep't of Hous. & Urban Dev.*, ___ F. Supp. 3d ___, 2020 WL 7658126, at *5 (W.D. Tenn. Nov. 6, 2020); *Brown v. Azar*, ___ F. Supp. 3d ___, 2020 WL 6364310, at *4–5 (N.D. Ga. Oct. 29, 2020).

## ANALYSIS

"In a case of actual controversy within its jurisdiction," the Declaratory Judgment Act authorizes a district court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Judgment as a matter of law is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Before a court may issue a permanent injunction, a plaintiff must demonstrate: (1) it has suffered an irreparable injury; (2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) a permanent injunction serves the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted). Essentially, this standard mirrors the considerations governing the issuance of a preliminary injunction, except that the plaintiff must also show actual success on the merits. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). While a court balances these factors, it must consider each of them, and "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quotation omitted).

## I. The Merits of Plaintiffs' Challenges

Plaintiffs mount several challenges to the CDC's eviction moratorium. First, they argue that the order exceeds the statutory authority Congress delegated to the agency in Section 361 of the Public Health Services Act, 42 U.S.C. § 264. Similarly, Plaintiffs maintain that CDC acted outside the scope of authority delegated to it in 42 C.F.R. § 70.2. (ECF No. 12, PageID #91–100.) Defendants disagree, but also maintain that Congress ratified the agency's action when it extended the moratorium in the Continuing Appropriations Act of 2021. (ECF No. 47, PageID #573–74.) These arguments raise two threshold issues, which in the Court's view are dispositive:

18

(1) whether the CDC has the statutory and regulatory authority for a nationwide moratorium on evictions; and (2) whether Congress ratified the CDC's order(s).

### I.A.    Statutory and Regulatory Authority for the CDC's Orders

When construing a statute, the Court determines and gives effect to the intent of Congress as expressed in the statute it enacted. *See, e.g.*, *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020) (citations omitted). The Court begins "where all such inquires must begin: with the text of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985)). Where the statute's language is plain, the inquiry also ends with the text. *Id.* Courts "endeavor to 'read statutes with an eye to their straightforward and commonsense meanings.'" *Black v. Pension Benefit Guar. Corp.*, 983 F.3d 858, 863 (6th Cir. 2020) (quoting *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010)). In doing so, courts ascribe "terms the ordinary meaning that they carried when the statute was enacted." *Id.* (citation and quotation omitted).

When reading a statute, the Court "consider[s] the entire text, in view of its structure and of the physical and logical relation of its many parts." *Hueso v. Barnhart*, 948 F.3d 324, 333 (6th Cir. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at p. 167 (2012)). A court may not look to isolated words or phrases taken out of context to determine a statute's meaning, but instead must account for both the specific text and the broader scheme. *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U. S. 365, 371 (1988); *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014)). "Lastly, before deferring to

19

an administrative agency's statutory interpretation, courts 'must first exhaust the traditional tools of statutory interpretation and reject administrative constructions' that are contrary to the clear meaning of the statute.'" *Black*, 983 F.3d at 863 (quoting *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018)).

### I.A.1. Plain Language

Accounting for amendments, Section 361 of the Public Health Service Act authorizes the promulgation and enforcement of regulations to protect the public health against the interstate spread of communicable diseases:

> The [CDC], with the approval of the [Secretary], is authorized to make and enforce such regulations as *in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the [Secretary] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction *of animals or articles found* to be so infected or contaminated as to be sources of dangerous infection to human beings, *and other measures, as in his judgment may be necessary.*

42 U.S.C. § 264(a) (emphasis added). In the statute's first sentence, Congress scarcely limits the power of the agency to accomplish this purpose, relying on its expert "judgment" of what is "necessary to prevent the introduction, transmission, or spread" of disease. *Id.* Standing alone, that first sentence sweeps broadly and appears to support Defendants' argument. If that were as far as the statute went, however, a reading that stopped there would likely raise a serious question whether Congress violated the Constitution by granting such a broad delegation of power unbounded by clear limitations or principles.

20

But the statute's first sentence does not stand alone. Its second sentence provides additional clarity and direction, both by virtue of following the first sentence and by expressly tying the first sentence to the power Congress authorized the agency to exercise. *Id.* ("For purposes of carrying out and enforcing such regulations . . . ."). This second sentence then lists illustrative examples of the types of actions the CDC may take. For example, the statute contemplates the "inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles." *Id.* Tying these actions to "animals or articles" links the agency's power to specific, tangible things on which the agency may act. Even a reading of the statute that links "destruction" to "animals or articles" leaves the other actions in the statute (inspection, fumigation, disinfection, sanitation, and pest extermination), which by their common meanings and understandings are tied to specific, identifiable properties. And the next limitation in the statute reinforces the agency's targeted power: "found to be so infected or contaminated as to be sources of dangerous infection to human beings." *Id.* With this language, Congress directs the agency to act on specific animals or articles which are themselves infected or a source of contagion that present a risk of transmission to other people.

That takes the Court to the final words of the first subsection of the statute, "and other measures, as in his judgment may be necessary," which at bottom drive the dispute between the parties. Defendants argue that the statute authorizes other measures beyond those specified. After all, the text uses examples and does not exhaust the range of permissible actions the agency may take. But to read the words

21

"other measures" as Defendants propose would divorce them from their context and take them in isolation without regard for what came before.  This the Court may not do.  *See Gundy*, 139 S. Ct. at 2126 (citing *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  Doing so creates at least three textual problems.

*First*, following the list of examples provided, "other measures" must be reasonably of the type Congress contemplated in the statutory text—fumigation, disinfection, destruction of animals or things, or other measures reasonably of this type.

*Second*, Congress directed the actions set forth in Section 361 to certain animals or articles, those so infected as to be a dangerous source of infection to people.  On the face of the statute, the agency must direct other measures to specific targets "found" to be sources of infection—not to amorphous disease spread but, for example, to actually infected animals, or at least those likely to be, which also have the required nexus with interstate or foreign commerce.

*Third*, the common meaning of the word "article" does not extend the agency's reach to an action such as evictions.  As used in the statute, an article means "a particular object or item."  *Article*, The American Heritage Dictionary (4th ed. 2000); *see also Article*, Oxford English Dictionary (20th ed. 1981) & (supp. 1987) (defining article as a material thing); *Merriam-Webster Online Dictionary*, https://www. merriam-webster.com/dictionary/article (last visited Mar. 10, 2021) (a particular kind of object).

Nothing about the remaining sections of the statue alters this conclusion. The balance of Section 361 deals with quarantine, 42 U.S.C. § 264(b)–(d), and preemption, *id.* § 264(e). While these provisions confirm that CDC has broad authority to act under the statute to prevent the transmission of communicable diseases, the additional subsections do not supplant the reach of the first or create other grounds justifying the orders at issue.

The most natural and logical reading of the statute as a whole does not extend the CDC's power as far as Defendants maintain. Such a broad reading of the statute, and the term "other measures" in particular, would authorize action with few, if any, limits—tantamount to creating a general federal police power. It would also implicate serious constitutional concerns, which Plaintiffs did not raise here. *See Terkel v. Centers for Disease Control & Prevention*, ___ F. Supp. 3d ____, 2021 WL 742877, at *4–6 (E.D. Tex. Feb. 25, 2021) (declaring that the moratorium exceeds the scope of federal power the Commerce Clause permits), *appeal filed*, No. 21-40137 (5th Cir. 2021). But the text does not authorize such boundless action or depend on the judgment of the Director of the CDC or other experts for its limits. The eviction moratorium in the CDC's orders exceeds the statutory authority Congress gave the agency.

### I.A.2. Other Relevant Decisions

Where the text of a statute is plain, the Court's task is at an end. *Ron Pair Enters.*, 489 U.S. at 241. Because the meaning of the statute is clear, there is no need to look to the canons of statutory construction. *See, e.g.*, *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Further, because the statute does not authorize the

agency's action, the Court need not separately analyze the regulation at 42 C.F.R. § 70.2, which the parties agree largely tracks the language of Section 361(a), 42 U.S.C. § 264(a). "[A]n agency literally has no power to act, . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). Therefore, the regulation cannot save the statute.

### I.A.2.a. *Brown* and *Chambless Enterprises*

Nonetheless, the Court acknowledges that, in reading the statute not to extend as far as Defendants contend, two district courts have reached the opposite conclusion. *Chambless Enters., LLC v. Redfield*, ___ F. Supp. 3d ___, 2020 WL 7588849, at \*5 (W.D. La. Dec. 22, 2020); *Brown*, ___ F. Supp. 3d at ___, 2020 WL 6364310, at \*9. Another court declined to enjoin the eviction moratorium without interpreting the statute. *Tiger Lily*, ___ F. Supp. 3d ___, 2020 WL 7658126, at \*1. Differing readings of the statute do not render it ambiguous. *See Bank of America Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 461 (1999) (Thomas, J., concurring) ("A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong."); *see also Rosmer v. Pfizer, Inc.*, 263 F.3d 110, 118 (4th Cir. 2001).

Among other disagreements with these decisions, the CDC's authority does not, in the Court's view, depend on whether the examples used in Section 361(a) are illustrative or exhaustive, as the *Brown* Court suggests. ___ F. Supp. 3d at ___, 2020 WL 6364310, at \*8. Nor do the provisions of subsections (b) through (d) somehow expand the language of subsection (a) or the agency's powers relating to "articles"

24

there.  *Id.*  Neither court considered the meaning of the phrase "animals or articles" in the statute or how it relates to the power Congress ultimately gave the agency. The *Chambless Enterprises* Court appears to ground its reasoning in a healthy dose of deference to the judgment of federal experts in the face of medical and scientific uncertainty.  ___ F. Supp. 3d at ____, 2020 WL 7588849, at *5.  Without question, effective pandemic response depends on the judgment of reliable science—not political science.  But that obvious truism does not empower agencies or their officials to exceed the mandate Congress gives them.

Overall, the *Brown* and *Chambless Enterprises* decisions have the feel of adopting strained or forced readings of the statute, stretching to rationalize the governmental policy at issue.  That is not a proper methodology of statutory interpretation.  Nor is it the proper role of the courts.  Although the Court reaches a different result than the *Brown* and *Chambless Enterprises* Courts, the language of the statute compels that result.

### I.A.2.b. FDA's Ban on Turtle Sales

Beyond these cases that considered the eviction moratorium, Defendants rely on *Independent Turtle Farmers of Louisiana, Inc. v. United States*, 703 F. Supp. 2d 604 (W.D. La. 2010), as do the courts in *Brown*, ___ F. Supp. 3d at ____, 2020 WL 6364310, at *8–9, and *Chambless Enterprises*, ___ F. Supp. 3d at ____, 2020 WL 7588849, at *5.

In *Independent Turtle Farmers*, the district court addressed the authority of the Food and Drug Administration to ban the sale of baby turtles as a public health

25

measure to curb the spread of salmonellosis, especially among children who are particularly susceptible. As relevant here, FDA enacted the ban pursuant to Section 361(a) based on a delegation of authority from the Secretary. Deferring to FDA's judgment, the court read the statute as providing illustrative, not exhaustive, examples of available public-health measures and upheld the ban, even though the text of the statute does not specifically provide for one. *Id.* at 620–21. Additionally, the court based its ruling on FDA's narrow tailoring of the ban. It barred sales of turtles as pets, which more likely involved children, but exempted turtle transactions for business or educational purposes. *Id.* at 620 n.20. In reaching this result, the court reaffirmed an earlier decision in *Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977), which upheld the ban even though it reached healthy turtles, not just those infected with disease-causing bacteria. *Independent Turtle Farmers*, 703 F. Supp. 2d at 618–19.

Here, the CDC moratorium is not tailored in the same way. It allows some evictions to proceed, including those based on criminal conduct, damage to property, or reasons other than nonpayment of rent. Such evictions have as much chance of spreading Covid-19 as those subject to the moratorium. More fundamentally, it does not follow that one district court's reading of Section 361(a) to authorize a ban on the sale of animals, which happen to be an uncommon pet and posed a health threat particularly to children, justifies the CDC's action here. Such a contention might well surprise a member of the public who is not a lawyer. In the end, *Independent Turtle Farmers* stands for the unremarkable proposition that the text of the statute provides

examples that are illustrative not exhaustive.  Even then, the decision makes clear
that the challenged ban at issue there was one other measure FDA could take that
was reasonably of the type Congress permitted under the statute.  *Id.* at 620.  It has
little to say about whether the statute authorizes the qualitatively different agency
action here.

### I.B.    Congressional Ratification of the Order

In its supplemental brief, Defendants contend that Congress ratified the CDC's
moratorium by enacting the Consolidated Appropriations Act of 2021.  (ECF No. 47,
PageID #573.)   By extending the CDC's first order, which was set to expire on
December 31, 2020, by thirty days, Congress expressed its view that the agency
necessarily had the authority for the eviction moratorium, or so Defendants maintain.
(*Id.* at PageID #573–74.)

It is well settled that Congress has the "power to ratify the acts which it might
have authorized[,]" in the first place; when it does so, the ratification amounts to
lawful action "equivalent to an original authority."  *United States v. Heinszen & Co.*,
206 U.S. 370, 384 (1907) (relating to ratification of a tax).  Put another way, "Congress
may, by enactment not otherwise inappropriate, ratify acts which it might have
authorized and give the force of law to official action unauthorized when taken."
*Swayne & Hoyt v. United States*, 300 U.S. 297, 301–02 (1937) (cleaned up).  When
Congress ratifies prior actions, however, it must do so clearly and "explicitly so
declare[]."  *See Heinszen*, 206 U.S. at 390 (citing *Lincoln v. United States*, 202 U.S.
484, 498 (1906)).  Ratification, or "congressional authorization," requires something

more than "mere acquiescence" to the action. *Hannah v. Larche*, 363 U.S. 420, 439 (1960).

Here, Congress in the Appropriations Act extended the date on which the CDC's first order expired. Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, div. N, tit. V, § 502, 134 Stat. 1182, 2097 (2020). But Congress did not speak to the merits of the policy at issue, as it did in the CARES Act. Nor did Congress amend the organic statute, Section 361 of the Public Health Services Act, either to create a new subsection authorizing an eviction moratorium or add such an action to the list of permissible agency actions in subsection (a). All Congress did was change the expiration date of the first order. In context, such a limited action makes sense. At that moment, congressional action facilitated the transition between presidential administrations and, effectively, gave the incoming administration the opportunity to determine its own policies for responding to the pandemic. In this way, the Appropriations Act does not amount to a ratification in any sense in which Congress has historically ratified prior actions. Accordingly, the Appropriations Act does not change the Court's conclusion that the agency's action exceeds its statutory authority.

## II.    Relief

Because Plaintiffs succeed on their claim in Count I that the order exceeds the agency's statutory authority, the Court need not reach Plaintiffs' remaining claims. The Court turns to the appropriate relief or remedy. Plaintiffs seek both a declaratory judgment and an injunction. (ECF No. 1, ¶¶ 1–2, PageID #19.)

## II.A.   Relief Under the Administrative Procedure Act

Plaintiffs lay claim to relief under the Administrative Procedure Act. (ECF No. 1, ¶¶ 58–77, PageID #13–14.)  Section 706 of the APA directs that a reviewing court "shall hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).  In evaluating agency action under the APA, assuming Section 361 leaves an eviction moratorium to the CDC's discretion (so-called *Chevron* "step zero"), the first step "employ[s] 'traditional tools of statutory construction' to determine whether 'Congress had an intention on the precise question at issue.'" *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1037 (6th Cir. 2018) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).  Where, as here, the statutory text is clear, that is the end of the matter because the Court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 842–43).  Because the Court determines that the statute is unambiguous and, by issuing a nationwide eviction moratorium, CDC exceeded the authority Congress gave it in Section 361, the Court holds that action unlawful and sets it aside, as the APA requires.

## II.B.   Injunctive Relief

Where an agency exceeds its authority, the APA contemplates an injunction as one form of relief. *See* 5 U.S.C. § 703.  In addition to success on the merits, to obtain an injunction Plaintiffs must also show irreparable harm, which is an "indispensable" prerequisite for injunctive relief. *D.T.*, 942 F.3d at 326.  On this score, the Court agrees with those that have addressed the issue in other cases and determines that

money damages can redress Plaintiffs' injury (though they do not seek them here) such that an injunction is not appropriate. *See Chambless Enterprises*, ___ F. Supp. 3d ____, 2020 WL 7588849, at *12–14; *Tiger Lily*, ___ F. Supp. 3d ____, 2020 WL 7658126, at *8–9; *Brown*, ___ F. Supp. 3d ____, 2020 WL 6364310, at *17–21. Contrary to Plaintiffs' argument, the Court does not read Section 706 of the APA as mandating injunctive relief every time an agency exceeds its statutory authority.

## II.C.   Relief Under the Declaratory Judgment Act

The APA also envisions declaratory judgments as a remedy.  *See* 5 U.S.C. § 703.  "[I]n a case of actual controversy within its jurisdiction," except for certain circumstances not relevant here, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 142 (1967).

Plaintiffs here are entitled to declaratory judgment.  The Court determines that the Centers for Disease Control and Prevention's orders—Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) and Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8020 (Feb. 3, 2021)—exceed the agency's statutory authority provided in Section 361 of the Public Health Service Act, 42 U.S.C. § 264(a), and the regulation at 42 C.F.R. § 70.2 promulgated pursuant to the statute, and are, therefore, invalid.

## CONCLUSION

This case involves the limited question whether Congress has given the Centers for Disease Control and Prevention the authority to make and enforce a nationwide moratorium on evictions. This case does not implicate broader policy considerations regarding such a moratorium or depend on judgments whether it constitutes sound public policy. On that issue, the Court expresses no opinion. Indeed, such a consideration falls outside the task of interpreting the applicable statutes and determining their meaning. Because of the plain meaning of Section 361, the Court enters judgment accordingly.

**SO ORDERED.**

Dated: March 10, 2021

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio