**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

CHAMBLESS ENTERPRISES LLC, *et al.*,

    Plaintiffs,

      v.

ROBERT REDFIELD, *et al.*,

    Defendants.

Case No. 3:20-cv-1455-TAD-KDM

Judge Terry A. Doughty

Magistrate Judge Kayla D. McClusky

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiffs submit this Notice of Supplemental Authority to inform the Court of the decision by the United States District Court for the District of Columbia in *Alabama Association of Realtors, et. al, v. United States Department of Health and Human Services, et al.*, No. 1:20-cv-03337-DLF (May 5, 2021), attached hereto as Exhibit 1. The District Court for the District of Columbia concluded, as have other federal courts to date, that the Defendants' expansive interpretation of the 42 U.S.C. § 264 was against the plain meaning of the statute and not entitled to deference. Exhibit 1 at p. 17. Additionally, the District of Columbia court held that Congress had not ratified Defendants' use of 42 U.S.C. § 264 when it extended the eviction moratorium by including § 502 in the Consolidated Appropriations Act, Pub. L. No. 116-260, § 502, 134 Stat. 1182 (2020). Exhibit 1 at p. 18. As such, the *Alabama Ass'n of Realtors* opinion vacated and set aside the Center for Disease Control and Prevention's eviction moratorium.

DATED:  May 6, 2021.

Respectfully submitted,

/s/ Steven M. Simpson
STEVEN M. SIMPSON*
DC Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org

/s/ James C. Rather, Jr.
JAMES C. RATHER, JR.
Louisiana Bar No. 25839
ALKER & RATHER, LLC
4030 Lonesome Rd., Suite B
Mandeville, LA 70448
Tel: (985) 727-7501
JRather@alker-rather.com

LUKE A. WAKE*
DC Bar No. 1009181
ETHAN W. BLEVINS*
Washington State Bar No. 48219
HANNAH SELLS MARCLEY*
Washington State Bar No. 52692
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Tel: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org
EBlevins@pacifclegal.org
HMarcley@pacificlegal.org
*Pro hac vice

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2021, I electronically filed the foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a copy to be served upon counsel of record.

DATED:  May 6, 2021.


/s/ Steven M. Simpson
STEVEN M. SIMPSON

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALABAMA ASSOCIATION OF REALTORS, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 20-cv-3377 (DLF) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

As part of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub.
L. No. 116-136, 134 Stat. 281 (2020), Congress enacted a 120-day eviction moratorium that
applied to rental properties receiving federal assistance, *id.* § 4024(b).  After that moratorium
expired, the U.S. Department of Health and Human Services (HHS), through the Centers for
Disease Control and Prevention (CDC), issued an order implementing a broader eviction
moratorium that applied to all rental properties nationwide, 85 Fed. Reg. 55,292 (Sept. 4, 2020),
which prompted this suit.  Since then, Congress has granted a 30-day extension of the CDC
Order, and the CDC has extended the order twice itself.  The current order is set to expire on
June 30, 2021.

In this action, the plaintiffs raise a number of statutory and constitutional challenges to
the CDC Order.  Before the Court is the plaintiffs' Motion for Expedited Summary Judgment,
Dkt. 6, as well as the Department's Motion for Summary Judgment, Dkt. 26, and Partial Motion
to Dismiss, Dkt. 32.  For the reasons that follow, the Court will grant the plaintiffs' motion and
deny the Department's motions.

I.      BACKGROUND

On March 13, 2020, then-President Trump declared COVID-19 a national emergency. *See generally* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).  Two weeks later, he signed the CARES Act into law.  *See* Pub. L. No. 116-136, 134 Stat. 281 (2020).  The CARES Act included a 120-day eviction moratorium with respect to rental properties that participated in federal assistance programs or were subject to federally-backed loans.  *See id.* § 4024.  In addition, some—but not all—states adopted their own temporary eviction moratoria. Administrative Record ("AR") at 966–72, 986–1024, Dkt. 40.  The CARES Act's federal eviction moratorium expired in July 2020.

On August 8, 2020, then-President Trump issued an executive order directing the Secretary of HHS ("the Secretary") and the Director of the CDC to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary to prevent the further spread of COVID-19 from one State or possession into any other State or possession."  Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners, Executive Order 13,945, 85 Fed. Reg. 49,935, 49,936 (Aug. 8, 2020).

Weeks later, on September 4, 2020, the CDC issued the "Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19" ("CDC Order"), pursuant to § 361 of the Public Health Service Act, 42 U.S.C. § 264(a), and 42 C.F.R. § 70.2.  85 Fed. Reg. 55,292 (Sept. 4, 2020).  In this order, the CDC determined that a temporary halt on residential evictions was "a reasonably necessary measure . . . to prevent the further spread of COVID-19."  85 Fed. Reg. at 55,296.  As the CDC explained, the eviction moratorium facilitates self-isolation for individuals

2

infected with COVID-19 or who are at a higher-risk of severe illness from COVID-19 given their underlying medical conditions. *Id.* at 55,294. It also enhances state and local officials' ability to implement stay-at-home orders and other social distancing measures, reduces the need for congregate housing, and helps prevent homelessness. *Id.* at 55,294.

The CDC Order declared that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person." *Id.* at 55,296. To qualify for protection under the moratorium, a tenant must submit a declaration to their landlord affirming that they: (1) have "used best efforts to obtain all available government assistance for rent or housing"; (2) expect to earn less than $99,000 in annual income in 2020, were not required to report any income in 2019 to the Internal Revenue Service, or received a stimulus check under the CARES Act; (3) are "unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses"; (4) are "using best efforts to make timely partial payments"; (5) would likely become homeless or be forced to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium is scheduled to end on December 31, 2020. *Id.* at 55,297.

Unlike the CARES Act's moratorium, which only applied to certain federally backed rental properties, the CDC Order applied to all residential properties nationwide. *Id.* at 55,293. In addition, the CDC Order includes criminal penalties. Individuals who violate its provisions are subject to a fine of up to $250,000, one year in jail, or both, and organizations are subject to a fine of up to $500,000. *Id.* at 55,296.

The CDC Order was originally slated to expire on December 31, 2020. *Id.* at 55,297. As part of the Consolidated Appropriations Act, however, Congress extended the CDC Order to

apply through January 31, 2021, Pub. L. No. 116-260, § 502, 134 Stat. 1182 (2020). On January 29, 2021, the CDC extended the order through March 31, 2021. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8020 (Feb. 3, 2021). In this extension, the CDC updated its findings to account for new evidence of how conditions had worsened since the original order was issued, as well as "[p]reliminary modeling projections and observational data" from states that lifted eviction moratoria "indicat[ing] that evictions substantially contribute to COVID-19 transmission." *Id.* at 8022. The CDC later extended the order through June 30, 2021. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 16,731 (Mar. 31, 2021).

## A. Procedural History

The plaintiffs—Danny Fordham, Robert Gilstrap, the corporate entities they use to manage rental properties (Fordham & Associates, LLC, H.E. Cauthen Land and Development, LLC, and Title One Management, LLC), and two trade associations (the Alabama and Georgia Associations of Realtors)—filed this action on November 20, 2020. Compl., Dkt. 1. They challenge the lawfulness of the eviction moratorium on a number of statutory and constitutional grounds. The plaintiffs allege that the eviction moratorium exceeds the CDC's statutory authority, *id.* ¶¶ 81–84 (Count III), violates the notice-and-comment requirement, *id.* ¶¶ 63–70 (Count I), and is arbitrary and capricious, *id.* ¶¶ 85–91 (Count IV), all in violation of the Administrative Procedure Act (APA). The plaintiffs further allege that the eviction moratorium fails to comply with the Regulatory Flexibility Act. *Id.* ¶¶ 71–78 (Count II). To the extent that the Public Health Service Act authorizes the eviction moratorium, the plaintiffs allege that the Act is an unconstitutional delegation of legislative power under Article I. *Id.* ¶¶ 92–95 (Count V). Finally, the plaintiffs allege that the eviction moratorium constitutes an unlawful taking of

property in violation of the Takings Clause, *id.* ¶¶ 96–103 (Count VI), violates the Due Process Clause, *id.* ¶¶ 96–110 (Count VII), and deprives the plaintiffs of their right of access to courts, *id.* ¶¶ 111–15 (Count VIII). The plaintiffs seek declaratory and injunctive relief, attorneys' fees and costs, and any other relief the Court deems just and proper. *Id.* ¶¶ 116–20.

Before the Court is the plaintiffs' expedited motion for summary judgment, Dkt. 6, and the Department's cross-motion for summary judgment. Also before the Court is the Department's partial motion to dismiss, Dkt. 32, in which the Department argues that Congress ratified the CDC Order when it extended the eviction moratorium in the Consolidated Appropriations Act of 2021. All three motions are now ripe for review.

### B. Relevant Decisions

This Court is not the first to address a challenge to the national eviction moratorium set forth in the CDC Order. In the last several months, at least six courts have considered various statutory and constitutional challenges to the CDC Order. Most recently, the Sixth Circuit denied a motion to stay a district court decision that held that the order exceeded the CDC's authority under 42 U.S.C. § 264(a), *see Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, No. 2:20-cv-2692, 2021 WL 1171887, at *4 (W.D. Tenn. Mar. 15, 2021) (concluding that the CDC Order exceeded the statutory authority of the Public Health Service Act), *appeal filed* No. 21-5256 (6th Cir. 2021); *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 992 F.3d 518, 520 (6th Cir. 2021) (denying emergency motion for stay pending appeal); *see also Skyworks, Ltd. v. Ctrs. for Disease Control & Prevention*, No. 5:20-cv-2407, 2021 WL 911720, at *12 (N.D. Ohio Mar. 10, 2021) (holding that the CDC exceeded its authority under 42 U.S.C. § 264(a)). Two other district courts, however, declined to enjoin the CDC Order at the preliminary injunction stage, *see Brown v. Azar*, No. 1:20-cv-03702, 2020 WL 6364310, at *9–

11 (N.D. Ga. Oct. 29, 2020), *appeal filed*, No. 20-14210 (11th Cir. 2020); *Chambless*

*Enterprises, LLC v. Redfield*, No. 20-cv-01455, 2020 WL 7588849, at *5–9 (W.D. La. Dec. 22,

2020), *appeal filed*, No. 21-30037 (5th Cir. 2021).  Separately, another district court declared

that the federal government lacks the constitutional authority altogether to issue a nationwide

moratorium on evictions.  *See Terkel v. Ctrs. for Disease Control & Prevention*, No. 6:20-cv-

564, 2021 WL 742877, at *1–2, 10–11 (E.D. Tex. Feb. 25, 2021), *appeal filed*, No. 21-40137

(5th Cir. 2021).

## II.  LEGAL STANDARD

Summary judgment is proper if the moving party "shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is

"material" if it has the potential to change the substantive outcome of the litigation.  *See id.* at

248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  And a dispute is "genuine" if a

reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.

*See Anderson*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In a case reviewing agency action, summary judgment "serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F.

Supp. 2d 76, 90 (D.D.C. 2006).  "[T]he entire case . . . is a question of law," and the district court

"sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C.

Cir. 2001) (internal quotation marks and footnote omitted).

III.   **ANALYSIS**

    **A. Standing**

Article III of the Constitution limits the "judicial Power" of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[T]here is no justiciable case or controversy unless the plaintiff has standing." *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). To establish standing, a plaintiff must demonstrate a concrete injury-in-fact that is fairly traceable to the defendant's action and redressable by a favorable judicial decision. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Since the CDC Order went into effect, the three real estate management company plaintiffs have each had tenants who have stopped paying rent, invoked the protections of the eviction moratorium, and would be subject to eviction but for the CDC Order. *See* Decl. of Danny Fordham ¶¶ 2–5, 9–17, Dkt. 6-2; Decl. of Robert Gilstrap ¶¶ 2, 4–12, Dkt. 6-3. At a minimum, these three plaintiffs have established a concrete injury that is traceable to the CDC Order and is redressable by a decision vacating the CDC Order. *See Summers*, 555 U.S. at 493. "[I]t is immaterial that other plaintiffs might be unable to demonstrate their own standing," *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019), because "Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing," *id.*

    **B. The Agency's Statutory Authority**

Section 361 of the Public Health Service Act empowers the Secretary to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" either internationally or between states.[1] 42

---

[1] "Although the statute states that this authority belongs to the Surgeon General, subsequent reorganizations not relevant here have resulted in the transfer of this responsibility to the Secretary." *Skyworks*, 2021 WL 911720, at *5.

U.S.C. § 264(a).  "For purposes of carrying out and enforcing such regulations," the Secretary is authorized to "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."  *Id.*  The Secretary is also authorized to, within certain limits, make and enforce regulations to apprehend, examine, and, if necessary, detain individuals "believed to be infected with a communicable disease" or who are "coming into a State or possession" from a foreign country.  *Id.* § 264(b)–(d).

By regulation, the Secretary delegated this authority to the Director of the CDC.  42 C.F.R. § 70.2.  Pursuant to this regulation, when the Director of the CDC determines that the measures taken by health authorities of any state or local jurisdiction are insufficient to prevent the spread of communicable disease, "he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."  *Id.*

In determining whether the eviction moratorium in the CDC Order exceeds the Department's statutory authority, the Department urges the Court to apply the familiar two-step *Chevron* framework.  *See* Defs.' Mot. for Summ. J. ("Def.'s Cross-Mot.") at 8 (citing *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).  While it is true that "the CDC did not follow APA notice-and-comment rulemaking procedures before issuing the Eviction Moratorium," Pl.'s Mem. in Supp. of Expedited Mot. for Summ. J. ("Pl.'s Mem.") at 21, Dkt. 6-1, "*Chevron* deference is not necessarily limited to regulations that are the product of notice-and-comment rulemaking," *Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 332

F.3d 654, 660 (D.C. Cir. 2003). The *Chevron* framework applies where "Congress [has] delegated authority to the agency generally to make rules carrying the force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead*, 533 U.S. 218, 226–27 (2001); *Fox v. Clinton*, 684 F.3d 67, 78 (D.C. Cir. 2012). Here, the CDC Order was issued pursuant to a broad grant of rulemaking authority, *see* 42 U.S.C. § 264(a) (authorizing the Secretary to "make and enforce" regulations "to prevent the introduction, transmission, or spread of communicable diseases."); 42 C.F.R. § 70.2 (delegating this authority to the Director of the CDC), and was "clearly intended to have general applicability." *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018). It was also issued "with a lawmaking pretense in mind," *Mead*, 533 U.S. at 233, published in the Federal Register, *see Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 467 (D.C. Cir. 2007), and backed with the threat of criminal penalties, 85 Fed. Reg. 55,296. Because the CDC Order was clearly intended to have the force of law, the two-step *Chevron* framework applies.[2]

   Applying *Chevron* and using the traditional tools of statutory interpretation, a court must first consider at Step One "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If Congress has directly spoken to [an] issue, that is the end of the

---

[2] The fact that section 361 of the Public Health Service Act is administered by both the CDC and the FDA, *see* Control of Communicable Diseases; Apprehension and Detention of Persons With Specific Diseases; Transfer of Regulations, 65 Fed. Reg. 49,906, 49,907 (Aug. 16, 2000), does not preclude application of the *Chevron* framework. While courts "generally do not apply *Chevron* deference when the statute in question is administered by multiple agencies," *Kaufman*, 896 F.3d at 483; *see also, e.g.*, *DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013), the FDA and the CDC are both sub-agencies within HHS. Accordingly, "there is nothing special to undermine *Chevron*'s premise that the grant of authority reflected a congressional expectation that courts would defer" to reasonable agency interpretations of the statute, and there is little risk of "conflicting mandates to regulated entities." *Loan Syndications & Trading Ass'n v. Sec. & Exch. Comm'n*, 882 F.3d 220, 222 (D.C. Cir. 2018) (summarizing instances where "*Chevron* is inapplicable due to the multiplicity of agencies").

matter." *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 558 (D.C.

Cir. 2016) (citing *Chevron*, 467 U.S. at 837). "[T]he court, as well [as] the agency, must give

effect to the unambiguously expressed intent of Congress." *Lubow v. U.S. Dep't of State*, 783

F.3d 877, 884 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 842–43). Only if the text is silent

or ambiguous does a court proceed to Step Two. There, a court must "determine if the agency's

interpretation is permissible, and if so, defer to it." *Confederated Tribes of Grand Ronde Cmty.*,

830 F.3d at 558. To determine "whether [an] agency's interpretation is permissible or instead is

foreclosed by the statute," courts use "all the tools of statutory interpretation," *Loving v. IRS*, 742

F.3d 1013, 1016 (D.C. Cir. 2014), and "interpret the words [of a statute] consistent with their

ordinary meaning at the time Congress enacted the statute," *Wisconsin Cent. Ltd. v. United*

*States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation marks and alteration omitted); *see also*

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012)

("Words must be given the meaning they had when the text was adopted.").

The first question, then, is whether the relevant statutory language addresses the "precise

question at issue." *Chevron*, 467 U.S. at 842. As noted, the Public Health Service Act provides,

in relevant part:

> The [CDC], with the approval of the Secretary, is authorized to make and enforce such
> regulations as in his judgment are necessary to prevent the introduction, transmission, or
> spread of communicable diseases from foreign countries into the States or possessions, or
> from one State or possession into any other State or possession. For purposes of carrying
> out and enforcing such regulations, the [Secretary] may provide for such inspection,
> fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles
> found to be so infected or contaminated as to be sources of dangerous infection to human
> beings, and other measures, as in his judgment may be necessary.

42 U.S.C. § 264(a). Other subsections of the Act authorize, in certain circumstances, the

quarantine of individuals in order to prevent the interstate or international spread of disease. *See*

*id.* § 264(b)–(d). Though the Public Health Service Act grants the Secretary broad authority to

10

make and enforce regulations necessary to prevent the spread of disease, his authority is not limitless.

Section 264(a) provides the Secretary with general rulemaking authority to "make and enforce *such regulations*," *id.* § 264(a) (emphasis added), that "in his judgment are necessary" to combat the international or interstate spread of communicable disease, *id.*  But this broad grant of rulemaking authority in the first sentence of § 264(a) is tethered to—and narrowed by—the second sentence.  It states: "For purposes of carrying out and enforcing *such regulations*," *id.* (emphasis added), the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination [and] destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings."  *Id.*

These enumerated measures are not exhaustive.  The Secretary may provide for "other measures, as in his judgment may be necessary."  *Id.*  But any such "other measures" are "controlled and defined by reference to the enumerated categories before it."  *See Tiger Lily*, 992 F.3d at 522–23 (internal quotation marks and alteration omitted); *id.* at 522 (applying the *ejusdem generis* canon to interpret the residual catchall phrase in § 264(a)).  These "other measures" must therefore be similar in nature to those listed in § 264(a).  *Id.*; *Skyworks*, 2021 WL 911720, at *10.  And consequently, like the enumerated measures, these "other measures" are limited in two significant respects: first, they must be directed toward "animals or articles," 42 U.S.C. § 264(a), and second, those "animals or articles" must be "found to be so infected or contaminated as to be sources of dangerous infection to human beings," *id.*; *see Skyworks,* 2021 WL 911720, at *10.  In other words, any regulations enacted pursuant to § 264(a) must be directed toward "specific targets 'found' to be sources of infection."  *Id.*

11

The national eviction moratorium satisfies none of these textual limitations. Plainly, imposing a moratorium on evictions is different in nature than "inspect[ing], fumigat[ing], disinfect[ing], sanit[izing], . . . exterminat[ing] [or] destr[oying]," 42 U.S.C. § 264(a), a potential source of infection. *See Tiger Lily*, 992 F.3d at 524. Moreover, interpreting the term "articles" to include evictions would stretch the term beyond its plain meaning. *See* Webster's New International Dictionary 156 (2d ed. 1945) (defining an "article" as "[a] thing of a particular class or kind" or "a commodity"); *see also Skyworks,* 2021 WL 911720, at *10. And even if the meaning of the term "articles" could be stretched that far, the statute instructs that they must be "found to be so infected or contaminated as to be sources of dangerous infection to human beings." 42 U.S.C. § 264(a). The Secretary has made no such findings here. The fact that individuals with COVID-19 can be asymptomatic and that the disease is difficult to detect, Mot. Hr'g Rough Tr. at 26,[3] does not broaden the Secretary's authority beyond what the plain text of § 264(a) permits.

The Department reads § 264(a) another way. In the Department's view, the grant of rulemaking authority in § 264(a) is not limited *in any way* by the specific measures enumerated in § 264(a)'s second sentence. Defs.' Cross-Mot. at 18, 19 n.2. According to the Department, Congress granted the Secretary the "broad authority to make and enforce" *any* regulations that "in his judgment are necessary to prevent the spread of disease," *id.* at 11 (internal quotation marks omitted), across states or from foreign countries. In other words, the grant of rulemaking authority in § 264(a)'s first sentence is a congressional deferral to "the 'judgment' of public

---

[3] The official transcript from the motions hearing held on April 29, 2021 is forthcoming, and this opinion will be updated to include citations to that transcript when it becomes available.

health authorities about what measures they deem 'necessary' to prevent contagion." *Id.* at 9 (quoting 42 U.S.C. § 264(a)).

The Department's interpretation goes too far. The first sentence of § 264(a) is the starting point in assessing the scope of the Secretary's delegated authority. But it is not the ending point. While it is true that Congress granted the Secretary broad authority to protect the public health, it also prescribed clear means by which the Secretary could achieve that purpose. *See Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). And those means place concrete limits on the steps the Department can take to prevent the interstate and international spread of disease. *See supra* at 11. To interpret the Act otherwise would ignore its text and structure.

At *Chevron*'s first step, this Court must apply the "ordinary tools of the judicial craft," *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 20 (D.C. Cir. 2019), including canons of construction, *see ArQule, Inc. v. Kappos*, 793 F. Supp. 2d 214, 219–20 (D.D.C. 2011). These canons confirm what the plain text reveals. The Secretary's authority does not extend as far as the Department contends.

*First*, "[i]t is… a cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted). Applying that principle here, the Department's broad reading of § 264(a)'s first sentence would render the second sentence superfluous. If the first sentence empowered the Secretary to enact *any* regulation that, in his "judgment," was "necessary" to prevent the interstate spread of communicable disease, *id.*, there would be no need for Congress to enumerate the "measures" that the Secretary "may provide for" to carry out and enforce those regulations, *see id.* Though the surplusage canon "is not absolute," *Lamie v.*

13

*U.S. Tr.*, 540 U.S. 526, 536 (2004); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006), like the plain language, it supports a narrow reading of the statute.

*Second*, the canon of constitutional avoidance instructs that a court shall construe a statute to avoid serious constitutional problems unless such a construction is contrary to the clear intent of Congress. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). An overly expansive reading of the statute that extends a nearly unlimited grant of legislative power to the Secretary would raise serious constitutional concerns, as other courts have found. *See, e.g., Skyworks,* 2021 WL 911720, at *9 (noting that such a reading would raise doubts as to "whether Congress violated the Constitution by granting such a broad delegation of power unbounded by clear limitations or principles."); *Tiger Lily*, 992 F.3d at 523 (same); *id.* ("[W]e cannot read the Public Health Service Act to grant the CDC power to insert itself into the landlord-tenant relationship without some clear, unequivocal textual evidence of Congress's intent to do so"); *Terkel*, 2021 WL 742877, at *4–6 (holding that the CDC's eviction moratorium exceeds the federal government's power under the Commerce Clause. Congress did not express a clear intent to grant the Secretary such sweeping authority.

And *third*, the major questions doctrine is based on the same principle: courts "expect Congress to speak *clearly* if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (emphasis added)); *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 959 (D.C. Cir. 2021) (collecting cases). There is no question that the decision to impose a nationwide moratorium on evictions is one "of vast economic and political significance." *Util. Air Regul. Grp.*, 573 U.S. at 324 (internal quotation marks omitted).

Not only does the moratorium have substantial economic effects,[4] eviction moratoria have been the subject of "earnest and profound debate across the country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (internal quotation marks omitted). At least forty-three states and the District of Columbia have imposed state-based eviction moratoria at some point during the COVID-19 pandemic, *see* 86 Fed. Reg. 16,731, 16,734, though, as the CDC noted in its most recent extension of the CDC Order, these protections either "have expired or are set to expire in many jurisdictions," *id.* at 16,737 n.35. Congress itself has twice addressed the moratorium on a nationwide-level—once through the CARES Act, *see* Pub. L. No. 116-136, § 4024, 134 Stat. 281 (2020), and again through the Consolidated Appropriations Act, *see* Pub. L. No. 116-260, § 502, 134 Stat. 1182 (2020).

Accepting the Department's expansive interpretation of the Act would mean that Congress delegated to the Secretary the authority to resolve not only this important question, but endless others that are also subject to "earnest and profound debate across the country." *Gonzales*, 546 U.S. at 267 (internal quotation marks omitted). Under its reading, so long as the Secretary can make a determination that a given measure is "necessary" to combat the interstate or international spread of disease, there is no limit to the reach of his authority.[5]

---

[4] In their briefing, the parties dispute the economic impact of the CDC order, *see, e.g.*, Pl.'s Mem. at 2 (estimating the nation's landlords will suffer "$55-76 billion" in losses as a consequence of the initial moratorium); Def.'s Cross-Mot. at 15 n.4 (disputing these figures). Regardless, the economic impact of the CDC Order is substantial. Indeed, the CDC itself estimates that "as many as 30-40 million people in America could be at risk of eviction" absent the CDC's moratorium as well as other State and local protections, 85 Fed. Reg. at 55,294–95. The CDC Order also qualifies as "a major rule under the Congressional Review Act," *id.* at 55,296, which means it is expected to have "an annual effect on the economy of $100,000,000 or more," 5 U.S.C. § 804(2).

[5] The only other potential limitation, imposed by regulation, is that the Director of the CDC would need to conclude that state and local health authorities have not taken sufficient measures to prevent the spread of communicable disease. *See* 42 C.F.R. § 70.2.

"Congress could not have intended to delegate" such extraordinary power "to an agency in so cryptic a fashion." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159. To be sure, COVID-19 is a novel disease that poses unique and substantial public health challenges, *see* Def.'s Cross-Mot. at 14, but the Court is "confident that the enacting Congress did not intend to grow such a large elephant in such a small mousehole." *Loving.*, 742 F.3d at 1021; *see also Brown & Williamson,* 529 U.S. at 160.

It is also telling that the CDC has never used § 264(a) in this manner. As the Department confirms, § 264(a) "has never been used to implement a temporary eviction moratorium," and "has rarely [been] utilized . . . for disease-control purposes." *See* Defs.' Cross-Mot. at 13–15, 23. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," the Court must "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324 (internal quotation marks omitted).

The Department advances one final counterargument. It notes that subsequent subsections of the statute, § 264(b)–(d), contemplate that the Secretary may, under certain carefully prescribed circumstances, provide for the "apprehension, detention, or conditional release of individuals" who are arriving in the United States from abroad or who are "reasonably believed to be infected with a communicable disease," 42 U.S.C. § 264(b)–(d). And it stresses that enforced quarantines are not listed in—and are different in kind from—the measures enumerated in § 264(a). Defs.' Cross-Mot. at 10–11. Accordingly, the Department contends that the presence of these subsequent subsections demonstrates that the list of means in the second sentence of § 264(a) imposes *no* limits on the Secretary's authority under § 264(a). *Id.*

This argument is not persuasive. No doubt, Congress intended to give the Secretary—and, by extension, health experts in the CDC—the discretion and flexibility to thwart the spread of disease. But the quarantine provisions in § 264(b)–(d) are structurally separate from those in § 264(a). *Tiger Lily*, 992 F.3d at 524 (noting that the provisions in § 264(b)–(d) restrict individual liberty interests, while § 264(a) is concerned exclusively with property interests). And regardless, like the enumerated measures in § 264(a), the quarantine provisions are cabined and directed toward individuals who are either entering the United States or "reasonably believed to be infected," 42 U.S.C. § 264(c)–(d), and "not to amorphous disease spread" more generally, *Skyworks*, 2021 WL 911720, at *10. The quarantine provisions in § 264(b)–(d) therefore do not provide support for the eviction moratorium.

In sum, the Public Health Service Act authorizes the Department to combat the spread of disease through a range of measures, but these measures plainly do not encompass the nationwide eviction moratorium set forth in the CDC Order.[6] Thus, the Department has exceeded the authority provided in § 361 of the Public Health Service Act, 42 U.S.C. § 264(a).

### C. Ratification of the CDC Order

In its partial motion to dismiss, the Department argues that Congress ratified the agency's action when it extended the moratorium in the Consolidated Appropriations Act.[7] *See* Defs.' Partial Mot. at 7–9. The initial CDC Order was set to expire on December 31, 2020, *see* 85 Fed.

---

[6] Because the CDC Order exceeds the Secretary's authority, the Court need not address the plaintiffs' remaining challenges to the eviction moratorium.

[7] The Department initially argued in its partial motion to dismiss that Counts I-V of the complaint were moot in light of Congress's extension of the CDC Order. Defs.' Mem. in Supp. of Partial Mot. to Dismiss ("Defs.' Partial Mot.") at 1, Dkt. 32-1. But this congressional extension of the CDC Order has since expired, so the Department has withdrawn this argument. *See* Joint Status Report at 2, Dkt. 36.

Reg. at 55,297, but Congress extended the expiration date until January 31, 2021, by including §

502 in the Consolidated Appropriations Act. Section 502 provided:

> The order issued by the Centers for Disease Control and Prevention under section 361
> of the Public Health Service Act (42 U.S.C. 264), entitled ''Temporary Halt in
> Residential Evictions To Prevent the Further Spread of COVID–19'' (85 Fed. Reg.
> 55292 (September 4, 2020) is extended through January 31, 2021, notwithstanding the
> effective dates specified in such Order.

Pub. L. No. 116-260, § 502, 134 Stat. 1182 (2020).

"Congress 'has the power to ratify the acts which it might have authorized' in the first

place," *Thomas v. Network Sols., Inc.*, 176 F.3d 500, 506 (D.C. Cir. 1999) (quoting *United States

v. Heinszen & Co.*, 206 U.S. 370, 384 (1907)), "and give the force of law to official action

unauthorized when taken," *Swayne & Hoyt v. United States*, 300 U.S. 297, 301–02 (1937). To

do so, however, Congress must make its intention explicit. *Heinszen*, 206 U.S. at 390.

Congress did not do so here. When Congress granted a temporary extension of the

eviction moratorium by enacting § 502, it acknowledged that the CDC issued its order pursuant

to the Public Health Service Act. It did not, however, expressly approve of the agency's

interpretation of 42 U.S.C. § 264(a) or provide the agency with any additional statutory

authority. *See Tiger Lily*, 992 F.3d at 524; *Skyworks,* 2021 WL 911720, at *12. Instead,

Congress merely extended the CDC Order for a limited 30-day duration.

"[C]ongressional acquiescence to administrative interpretations of a statute" is

"recognize[d]. . . with extreme care." *See Solid Waste Agency of N. Cook Cty. v. U.S. Army

Corps of Eng'rs*, 531 U.S. 159, 160 (2001). "[M]ere congressional acquiescence in the CDC's

assertion that the [CDC Order] was supported by 42 U.S.C. § 264(a) does not make it so." *Tiger

Lily*, 992 F.3d at 524. Because Congress withdrew its support for the CDC Order on January 31,

2021, the order now stands—and falls—on the text of the Public Health Service Act alone. For

all the reasons stated above, *supra* Part III.B., the national eviction moratorium in the CDC Order is unambiguously foreclosed by the plain language of the Public Health Service Act.

### D. Remedy

Both parties agree that if the Court concludes that the Secretary exceeded his authority by issuing the CDC Order, vacatur is the appropriate remedy. *See* Mot. Hr'g Rough Tr. at 13, 30–31. Nonetheless, the Department urges the Court to limit any vacatur order to the plaintiffs with standing before this Court. Defs.' Partial Mot. to Dismiss at 23. This position is "at odds with settled precedent." *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019).

This Circuit has instructed that when "regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioner is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks omitted); *see also O.A.*, 404 F. Supp. 3d at 109. Accordingly, consistent with the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and this Circuit's precedent, *see Nat'l Mining Ass'n*, 145 F.3d at 1409, the CDC Order must be set aside.

***

The Court recognizes that the COVID-19 pandemic is a serious public health crisis that has presented unprecedented challenges for public health officials and the nation as a whole. The pandemic has triggered difficult policy decisions that have had enormous real-world consequences. The nationwide eviction moratorium is one such decision.

It is the role of the political branches, and not the courts, to assess the merits of policy measures designed to combat the spread of disease, even during a global pandemic. The question for the Court is a narrow one: Does the Public Health Service Act grant the CDC the legal authority to impose a nationwide eviction moratorium? It does not. Because the plain

language of the Public Health Service Act, 42 U.S.C. § 264(a), unambiguously forecloses the nationwide eviction moratorium, the Court must set aside the CDC Order, consistent with the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(C), and D.C. Circuit precedent, *see* *National Mining Ass'n*, 145 F.3d at 1409.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for expedited summary judgment is granted and the Department's motion for summary judgment and partial motion to dismiss are denied. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

May 5, 2021